SPN/PTH/KTF/VAZ
F.#2015R00747

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

        - against -                 Docket No. <u>15-CR-252 (S-3) (PKC)</u>

FULL PLAY GROUP SA, <u>et</u> <u>al</u>.,

             Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - -X


## GOVERNMENT'S MEMORANDUM OF LAW IN <u>OPPOSITION TO THE DEFENDANTS' MOTIONS IN LIMINE</u>


                                         BREON PEACE
                                         UNITED STATES ATTORNEY
                                         Eastern District of New York
                                         271 Cadman Plaza East
                                         Brooklyn, New York 11201


Samuel P. Nitze
Patrick T. Hein
Kaitlin T. Farrell
Victor A. Zapana
Assistant U.S. Attorneys
     (Of Counsel)

PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in opposition to motions in limine filed by defendant Carlos Martinez, in which defendant Hernan Lopez joins, and defendant Full Play Group, S.A. ("Full Play").  Martinez and Lopez seek orders (1) excluding the admission of racketeering evidence against them and granting a limiting instruction that any such evidence should not be considered against them, see ECF Dkt. No. 1698; (2) admitting into evidence certain statements made by the government in bills of particulars filed on October 1, 2021 and January 11, 2022 (the "Bills of Particulars"), see ECF Dkt. Nos. 1699 (Motion to admit government statements), 1636 ("First BOP"), 1684 ("Second BOP"); and (3) precluding government agents from testifying as fact and expert witnesses and prohibiting law enforcement agents from offering conclusions about the facts of the case or providing summary testimony, see ECF Dkt. No 1701.  Full Play seeks to admit evidence relating to the laws of various foreign jurisdictions.  See ECF Dkt. No. 1702.

The government agrees that evidence admitted solely for the purpose of proving the racketeering conspiracy charge against Full Play is inadmissible as to Martinez and Lopez, though much of the racketeering evidence also serves as evidence of the Copa Libertadores wire fraud and money laundering offenses alleged against all three defendants.  Accordingly, the government does not oppose an appropriate limiting instruction regarding racketeering evidence but respectfully requests that the Court defer the drafting of such an instruction until trial is under way and the scope of the government's racketeering proof has been established.  The government does not intend to elicit testimony from law enforcement agents that offers conclusions about the charged conduct, but it is entirely appropriate for law enforcement witnesses to serve as summary witnesses and to provide testimony of the sort provided in the 2017 trial.  Accordingly, the Court

should deny Martinez and Lopez's motion to the extent it seeks to preclude summary testimony from law enforcement witnesses and should defer ruling on any objection to arguably improper "expert" testimony from such witnesses.  The remainder of the Defendants' arguments are meritless and should be rejected.

<u>ARGUMENT</u>

I.    <u>The Defendants' Motion to Limit the Admissibility and Consideration of RICO Evidence</u>

Martinez and Lopez seek an order excluding the admission of racketeering evidence against them at trial and granting a limiting instruction that such evidence should not be considered against them.  The government does not oppose the request in principal but notes that all evidence of the charged Copa Libertadores schemes also constitutes racketeering evidence and is of course directly admissible against Martinez and Lopez.  The government agrees that evidence probative <u>solely</u> of the racketeering charge is admissible only as to Full Play.  The government does not oppose a limiting instruction to that effect but submits that such an instruction should be crafted against the actual trial record.  The government notes, as it has argued previously, that this is not a case that presents a substantial risk of spillover prejudice.  ECF Dkt. No. 1639 at 4-5.

II.   <u>The Defendants' Motion to Admit Statements of the Government Should be Denied</u>

Martinez and Lopez move to admit into evidence at trial certain statements made by the government in its filings providing further particulars pursuant to Court orders dated October 29, 2021 (documenting oral order issued on September 17, 2021) and December 14, 2021.  <u>See</u> ECF Dkt. Entries dated Sept. 17, 2021 and Dec. 14, 2021; ECF Dkt. No. 1645 (Order dated Oct. 29, 2021).  Martinez and Lopez argue that statements made by the government in the two Bills of Particulars are inconsistent, rendering the statements relevant to whether Martinez and

2

Lopez committed the charged offenses and admissible as statements of a party-opponent.  The argument is frivolous and should be rejected as such.

    A.  <u>Relevant Background</u>

        The pending third superseding indictment (the "Indictment") charges Lopez, Martinez, Full Play (collectively, the "Defendants"), and several co-conspirators with, among other offenses, wire fraud and money laundering conspiracies in connection with the payment of bribes to certain CONMEBOL officials in exchange for the broadcasting rights to the Copa Libertadores and related club team events.  Ind. ¶¶ 71-74.  The Indictment alleges that the Defendants, along with Alejandro Burzaco, former CEO of Argentina-based sports marketing and production company Torneos y Competencias, S.A., and Full Play principals Hugo and Mariano Jinkis participated in the charged schemes "at various times between 2005 and 2015," and that a broader group of defendants engaged in the scheme "[i]n or about and between 2000 and 2015." <u>Id.</u> ¶¶ 130, 135.

        The government filed the First BOP on October 1, 2021, following briefing, oral argument, and the Court's order entered on September 20, 2021 (the "Sept. 20 Order") directing the disclosure of further particulars.  In response to the Court's direction that the government "provide the year(s) when Defendants Lopez and Martinez are alleged to have become aware of the Copa Libertadores #2 scheme," <u>see</u> ECF Dkt. Entry dated Sept. 20, 2021, the government stated:

> The government's proof at trial will establish that Hernan Lopez became aware of the charged Copa Libertadores scheme no later than 2010, that Carlos Martinez became aware of the scheme no later than 2011, and that both men likely were aware of the scheme as early as 2007.
>
> The government notes that it is not required to allege (and has not alleged) or prove the precise date or even the precise year on/in

3

which a particular defendant became aware of or joined a charged conspiracy. Here, the government's proof at trial is likely to focus on the defendants' participation in the charged scheme in 2010 and after, but the government also intends to introduce evidence from earlier years that is probative both of the defendants' likely involvement in the scheme before 2010 and their participation in the scheme in 2010 and beyond.

The government also identified certain contracts and tournaments it alleges were tainted by the charged conduct, pursuant to the Court's direction that the government "specify[] the transactions, for example, the marketing contracts, broadcasting contracts, tournament hosting designations, etc. that the Government will seek to prove were tainted by an unlawful conspiracy of which that Defendant was a part." Sept. 20 Order.

On November 23, 2021, defendants Martinez and Lopez filed a motion to compel compliance with the Sept. 20 Order, arguing that the government had failed adequately to specify the transactions tainted by the charged conspiracies. See ECF Dkt. No. 1653. Martinez and Lopez stated that the government's discovery productions to date included "approximately 230 agreements . . . , many of which relate to the television rights at issue," suggesting they were unable to determine which of those contracts were alleged to be tainted by the charged conduct (the government notes that some of the contracts involved wrestling, boxing, car racing, and other matters clearly unrelated to the charged conduct). Id. at 3. The government opposed the motion, arguing that it had already complied with the Sept. 20 Order. See ECF Dkt. No. 1660. At oral argument held on December 14, 2021, the government indicated that part of the difficulty in providing further particulars sufficient to satisfy the Court's order was inherent ambiguity in the word "tainted," which, the government argued, "requires some definition." Tr. at 18. The government noted further that it was wary of providing a list of tainted contracts that would then

4

be construed to limit the universe of contracts probative of the charged schemes.  Id. at 19-20.  In

response to this argument, the Court gave the following guidance:

> It's your case.  It's your theory.  And if your theory is yes, this
> ancillary contract downstream supplemented, amended, whatever
> you want to call it, is tainted by the original bribe, then just let the
> other side know.  You can make that as broad as you like.  It's really
> up to the government to say here are all the ones we think are
> affected by the original bribe, tainted by the original bribe, because
> they would not have existed but for that original bribe however you
> want to define it.  So it's not really I'm defining it or the defense is
> defining it.  The question is what is the government's theory about
> these different contracts and which ones were obtained through
> bribery, either directly or indirectly.
>
> . . .
>
> If the defense has notice of these agreements, then likely you'll get
> them in, but I think you do yourself a better service or avoid
> problems down the road if you're overly broad by saying here are
> all the contracts we think were obtained through this fraudulent
> arrangement or are byproducts of it, for lack of a better definition.

Tr. at 20-21.

The Court granted the motion to compel to the extent it sought further specification

of the transactions and contracts tainted by the alleged bribery.  See ECF Dkt. Entry dated Dec.

14, 2021.  Following the Court's order, and as a courtesy, the government wrote to counsel for

Martinez and Lopez and offered to review the list of 230 contracts referenced in their motion to

compel and to indicate which contracts on that list were tainted by the charged conduct.  By letter

dated January 5, 2022, the defendants provided the government with their list of contracts,

identified by Bates number.  On January 11, 2022, the government filed the Second BOP,

providing a further list of contracts tainted by the Copa Libertadores counts, identified by Bates

numbers corresponding to the numbers used in the defendant's list, along with particulars relating

to other schemes alleged against Full Play.  ECF Dkt. No. 1684.  In keeping with the spirit of the

Court's guidance during oral argument, the government tried to be over-inclusive and to provide language descriptive of the government's view as to the tainted contracts, stating, among other things, that "[f]or avoidance of doubt, the government alleges that any contract involving the sale, assignment, license, sublicense, or other monetization of the Copa Libertadores rights by a Twenty-First Century Fox entity with which Lopez or Martinez was affiliated is a contract tainted by the conduct alleged in the Copa Libertadores counts." Id. at 5.

On January 12, 2022, Martinez and Lopez sent a letter to the government noting that some of the contracts identified by the government in the Second BOP were executed before 2007, the year identified in the First BOP as the earliest Martinez and Lopez became aware of the charged conspiracy. ECF Dkt. No. 1699 (CM Mot. to Admit Gov't Statements), Ex. A. The defendants asked for clarification of what they termed "seemingly incongruent" assertions. Id. at 3. The government responded by email the following day to clarify that, although the government does not intend to prove that Martinez and Lopez engaged in criminal conduct before 2007, even agreements executed before then were arguably tainted by conduct that took place even after 2007. Id. at 1. The government gave the example of a contract executed in 2001 that covered editions of the Copa Libertadores through 2007. Id. The government also noted that some of the earlier contracts had rights of first refusal that arguably carried their provisions into subsequent years. Id. The government urged defendants to take the list together with particulars provided to date in construing the list of specified contracts, which was, per the Court's direction, overinclusive and included all contracts on the defendants' own list that were tainted by bribery. Id.

B. Applicable Law

Rule 801(d)(2) of the Federal Rules of Evidence ("Rule 801(d)(2)") excludes from the definition of hearsay the following types of out-of-court statements:

> Admission by party-opponent. The statement is offered against a party and is (A) the party's own statement in either an individual or a representative capacity or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, or (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

Although a government attorney's statements may be admitted against the government as a litigant under FRE 801(d)(2) under certain circumstances, such statements must meet three criteria:

> First, the district court must be satisfied that the prior argument involves an assertion of fact inconsistent with similar assertions in a subsequent trial. Second, the court must determine that the statements of counsel were such as to be the equivalent of testimonial statements made by the client. Last, the district court must determine by a preponderance of the evidence that the inference that the proponent of the statements wishes to draw is a fair one and that an innocent explanation for the inconsistency does not exist.

United States v. Ford, 435 F.3d 204, 215 (2d Cir. 2006) (internal quotations omitted) (quoting United States v. McKeon, 738 F.2d 26, 33 (2d Cir. 1984)); see also United States v. GAF Corp., 928 F.2d 1253, 1262 (2d Cir. 1991).

C.  Discussion

Martinez and Lopez's argument that statements made by the government in the Bills of Particulars filed in this case are admissible as admissions by a party-opponent finds no support in the factual record of this case or in the law and should be rejected.  The motion to admit government statements at trial rests on the factual premise that the government has made inconsistent statements regarding when, in its view, Martinez and Lopez are alleged to have joined the charged conspiracy, and on the legal premise that the purported inconsistencies render certain

statements of the government relevant and admissible at trial under the standard set forth above. Both premises are wrong.

First, there is no inconsistency in or among the allegations in the Indictment, First BOP, Second BOP, or statements made by the government on the record in this case. In arguing to the contrary, Martinez and Lopez take statements from the Bills of Particulars out of context, ignore statements of the Court clarifying the scope of the information to be provided by the government, and abandon common sense in their attempt to twist the government's efforts to be overinclusive into evidence of inconsistent theories as to the defendants' involvement in the charged conduct. The Indictment alleges that Lopez, Martinez, Full Play, and others participated in the scheme at various times between 2005 and 2015. In the First BOP, the government further clarified – entirely consistent with the allegations in the Indictment – that it expects the evidence at trial will establish that Lopez became aware of the charged Copa Libertadores scheme no later than 2010, that Carlos Martinez became aware of the scheme no later than 2011, and that both defendants likely were aware of the scheme as early as 2007.[1] There is nothing inconsistent in the statement that Martinez knew of the conspiracy no later than 2011 (i.e., the evidence makes clear that he knew by 2011) and as early as 2007 (i.e., there is evidence indicating that he knew in 2007). The defendants cite to the threshold requirement that, in order to introduce a prosecutor's statement at trial, the prosecution must have "offered clearly inconsistent assertions of fact," but they fail to

---

[1] Needless to say, the government intends to prove not just that the defendants were aware of the charged schemes but that they joined and actively participated in the advancement of the charged conspiracies.

identify even arguably inconsistent assertions, must less clearly inconsistent ones.  Martinez Br. at 6 (citing McKeon, 738 F.2d at 33).

In an apparent effort to generate at least some surface appearance of inconsistency, Martinez and Lopez turn to the list of contracts set forth in the Second BOP and argue that the inclusion of a contract executed in February 2002, for example, "suggest[s] that Mr. Martinez was somehow involved in the Copa Libertadores scheme in February 2002, or at least was aware that contracts that had been entered into in 2002 were tainted by an unlawful conspiracy of which he was a part."  Martinez Br. at 6.  The argument is unavailing.  For one thing, the conspiracies "of which [Martinez and Lopez were] a part" were under way before they joined the conspiracies, so the government's identification of contracts tainted by conduct pre-dating the defendants' entry into the conspiracies was consistent with the Court's order directing disclosure of further particulars.  See United States v. U.S. Gypsum Co., 333 U.S. 364, 393 (1948) ("With the conspiracy thus fully established, the declarations and acts of the various members, even though made or done prior to the adherence of some to the conspiracy become admissible against all as declarations or acts of co-conspirators in aid of the conspiracy."); United States v. Farhane, 634 F.3d 127, 161 n.5 (2d Cir. 2011) ("Where statements are made in the course of an existing conspiracy in which the defendant later joins, those statements may be admitted against him, even though he was not a member of the conspiracy at the time the statements were made, on the theory that he assumes the risk for what has already happened in the scheme" (internal quotation marks omitted)).

More to the point, to the extent Martinez and Lopez were confused upon reading the Second BOP, their confusion cannot have survived the government's subsequent letter clarifying its reasons for including the earlier contracts.  The government made clear that it does

not intend to prove that Martinez or Lopez engaged in criminal conduct before 2007 and that it included the earlier contracts because they were tainted by bribery and because, in some instances, those contracts and/or the effects of their procurement through corruption continued into the period of years during which Martinez and Lopez were members of the conspiracy.[2]  ECF Dkt. No. 1699, Ex A. at 1.  As the case law makes plain, before admitting the statement of a government attorney as a prior admission, a district court must first determine that the government made an assertion of fact inconsistent with a similar assertion in a previous proceeding.  See United States v. Ford, 435 F.3d 204, 215 (2d Cir. 2006); see also United States v. Alston, No. 15-CR-435 (CM), 2016 WL 5806790, at *6 (S.D.N.Y. Sept. 27, 2016) ("Although a prior statement by an attorney during litigation may under some circumstances be considered a party admission under Federal Rule of Evidence 801(d)(2), the Second Circuit has carefully circumscribed the use of such statements.") (citing McKeon, 738 F.2d at 30-36).  The defendants have identified no such inconsistency here, because there was none.

Martinez and Lopez's motion repeatedly references purported inconsistencies and lack of clarity in the government's statements, but, at bottom, their complaint is actually more about a perceived lack of specificity regarding the timing of the defendants' entries into the

---

[2]  The government notes that it reviewed a list of contracts provided by the defendants themselves, who included contracts predating 2007 – and referenced them in filings – notwithstanding the government's previous statements that it did not intend to prove criminal conduct by Martinez and Lopez before 2007.  The government has consistently tried to provide more information than required by the law and by the Court but is now being dragged into semantic gamesmanship for its efforts.  For example, during a period of meeting and conferring, in writing and orally, over the details provided in the First BOP, the government noted that it had attempted, in its formulation of the First BOP, to provide additional information about the likely focus of proof at trial.  The government wrote, in part, in a follow-up email dated November 5, 2021:  "As stated during our recent telephone call, if you prefer a statement that is more direct (and, in our view, less detailed) than the one we provided in the letter [BOP1], here it is:  We allege that your clients became aware of the Copa Libertadores scheme in 2007."

charged conspiracies, which is not the same thing.  On this score, it bears emphasizing that, as the defendants all but concede, the government is not required to prove, or to know, the date on which a defendant entered a conspiracy to carry its burden of proving the defendant's guilt of participating in that conspiracy.  See, e.g., Martinez Br. at 7 ("[T]he government is under no obligation to prove an exact entry date."); United States v. Shkreli, No. 15-CR-637 (KAM), 2016 WL 8711065, at *7 (E.D.N.Y. Dec. 16, 2016) ("The Government is not required to prove, never mind provide ahead of trial, exactly when a conspiracy was formed or exactly when a particular defendant joined the alleged scheme." (internal quotation marks omitted)); United States v. Oruche, No. 07-CR-124 (WHP), 2008 WL 612694, at *3 (S.D.N.Y. Mar. 5, 2008), aff'd sub nom., United States v. Oluigbo, 375 F. App'x 61 (2d Cir. 2010) ("[T]he government is not required to prove exactly when or how a conspiracy was formed or when or how a particular defendant joined the scheme." (internal quotation marks omitted)); United States v. Jones, No. 00-CR-182 (JGK), 2000 WL 1448640, at *4 (S.D.N.Y. Sept. 28, 2000) (observing that, "as the circumstantial proof on which the government usually relies to prove the existence of a scheme often does not reveal such details, the courts have consistently rejected demands for particulars as to the formation of a conspiracy or the entry into the conspiracy of a particular defendant or confederate" (internal quotation marks omitted)); United States v. Pacheco, 902 F. Supp. 469, 474 (S.D.N.Y. 1995) ("In general, the government is not required to prove how or when the conspiracy was formed or how or when defendants joined the conspiracy."); cf. ECF Dkt. No. 872 at 20-21 (Jury Instructions) ("Because conspiracy is usually characterized by secrecy, you may infer its existence from the

circumstances and conduct of the parties and others involved. . . .  [Moreover, a] conspirator's

guilt is not measured by the extent or duration of his participation.").

In support of their motion, Martinez and Lopez rely almost entirely on GAF, 928

F.2d 1253, a securities fraud and market manipulation case from more than three decades ago that

only serves to underscore the weakness of the defendants' arguments.  In GAF, the same set of

defendants was tried three times on the same securities fraud, wire fraud, and related charges in

connection with an alleged market manipulation scheme.  Id. at 1255.  The first trial ended in a

mistrial based on late disclosure of an expert report; the jury deadlocked following the second trial;

and the third trial resulted in convictions on all counts for two of four defendants.  Id. at 1257.

Before the first trial, the government filed a bill of particulars indicating that there were four

fraudulent transactions at issue, two from October and two from November of 1986.  Id. at 1257-

58.  At the second trial, defense counsel argued that if there was reasonable doubt about whether

the defendants were responsible for the November stock purchases, then there must be reasonable

doubt regarding the October trades.  Id. at 1258.  Between the second and third trials, the

government filed an amended bill of particulars, which included only the October trades.  Id.  At

the third trial, the defense sought to introduce the original bill of particulars that included the

November trades as part of the series of fraudulent and manipulative transactions.  Id.  The district

court denied the request, and, after the defense again pointed to the November trades during closing

summations, the government emphasized in rebuttal that the November trades were "not in this

indictment," that the November trades were a "smokescreen," and that "this case is not about the

November trades."  Id.

The GAF defendants argued on appeal that the "government's original version of

the events, which linked the October and November trades, had been discredited at the second trial

and the government, therefore, deliberately adopted fundamental changes in its version of the facts in order to enhance its chances of success." Id. at 1258-59. The Circuit held "that, if the government chooses to change its strategy at successive trials, and contradict its previous theories of the case and version of the historical facts, the jury is entitled to be aware of what the government has previously claimed, and accord whatever weight it deems appropriate to such information." Id. at 1262. The Circuit noted that the government's previous position "that the October and November trades were linked is certainly relevant to the defense." Id. The Circuit held that "the unusual history and circumstances of this case required that the court admit into evidence the original bill of particulars for the jury's comparison, and that the court give an instruction similar to that requested concerning the defendants' theory of the case." Id. at 1255.

This case presents none of the "unique history or circumstances" referenced by the court in GAF, in which the government made clearly inconsistent statements regarding which transactions were fraudulent over the course of three trials against the same defendants. Cf. 928 F.3d at 1261 & n.3 (noting considerations counseling against admitting a prior bill, such as when the "inconsistency" is not "plain" and "clear[]"). The government's statements here have been consistent – and in any event surely cannot be described as clearly inconsistent. The government has not changed its strategy, made "fundamental change[s] in its version of the facts," or contradicted previous theories of the case in any respect, let alone "repeated[ly]." Id. at 1260-62. Nor have the defendants articulated the relevance of the statements it proposes to introduce, listed at ECF Dkt. No. 1699 at 2, other than to suggest that the purported lack of specificity in government statements about when, exactly, the defendants joined the conspiracy makes it more likely that they never joined the conspiracy, an argument verging on incoherence.

13

In sum, the motion to admit statements in the Bills of Particulars as admissions of a party-opponent is meritless and should be denied in its entirety.

III.   The Defendants' Motion to Preclude Certain Testimony of Law Enforcement Witnesses Is Premature and Meritless

Defendants Martinez and Lopez seek an order precluding law enforcement agents from providing purportedly "expert" testimony on certain topics, including as to whether certain entities or transactions were involved in the payment of bribes, and from providing summary testimony.  The government agrees that law enforcement agents may not provide conclusions as to the charged criminal conduct and does not intend to elicit such testimony.  It is appropriate, however, for government agents to serve as summary witnesses and to provide testimony of the sort provided in the 2017 trial.  Accordingly, the defendants' motion should be denied to the extent it seeks to prevent the government from providing admissible summary testimony from law enforcement agents.

A.   Relevant Background

During the 2017 trial, the government introduced lay – not expert – testimony of IRS-Criminal Investigation Special Agent Steven Berryman.  As is customary at a criminal trial, Berryman testified at a high level regarding steps that he took during his investigation of the charged criminal conduct and regarding various bank records, wire transactions, and other related documents that he and the prosecution team obtained during their investigation and that had been admitted into evidence at trial prior to his testimony.  During this testimony, Berryman also testified regarding connections among previously admitted government exhibits – including bank records, wire transactions, and bribery ledgers – insofar as he read from and/or briefly described entries contained in these exhibits.

B. <u>Legal Standard</u>

The government is permitted to introduce testimony of a law enforcement agent as a summary witness regardless of whether the agent provides lay opinion testimony under Federal Rules of Evidence 701 ("Rule 701") or expert witness testimony under Rule 702.  <u>See, e.g.</u>, <u>United States v. Riglioni</u>, 694 F. App'x 14, 16 (2d Cir. 2017) (holding that the district did not err under Rules 701 and 901(b)(5) by admitting the agent's lay opinion identifying the defendant's voice on recordings); <u>United States v. Dukagjini</u>, 326 F.3d 45, 53-54 (2d Cir. 2003) (discussing cases where "a fact witness or a case agent also functions as an expert for the government"); <u>United States v. Cadet</u>, No. 08-CR-458 (NGG), 2009 WL 2959606, at *4 (E.D.N.Y. Sept. 11, 2009) (discussing the bounds of an expert summary witness). Lay opinion testimony pursuant to Rule 701 is admissible if it is (a) "rationally based on the witness's perception," (b) helpful to the jury in "clearly understanding the witness's testimony" or "determining a fact in issue," and (c) not based on "scientific, technical, or other specialized knowledge within the scope of Rule 702."  <u>See</u> Fed. R. Evid. 701.  Thus, to qualify under Rule 701, the opinion should be based on the "reasoning processes familiar to the average person in everyday life."  <u>United States v. Garcia</u>, 413 F.3d 201, 215 (2d Cir. 2005).

An agent's lay witness testimony is appropriate where it "'does no more than analyze facts already introduced into evidence and spell out the [] consequences that necessarily flow from those facts.'"  <u>United States v. Barnwell</u>, No. 15-CR-620 (NSR), 2017 WL 1063457, at *2 (S.D.N.Y. Mar. 20, 2017) (permitting an IRS agent to testify as a summary witness on behalf of the government) (quoting <u>United States v. Stierhoff</u>, 549 F.3d 19, 27-28 (1st Cir. 2008)); <u>see also</u> <u>United States v. Pree</u>, 408 F.3d 855, 869 (7th Cir. 2005) ("It is well established that the nature of a summary witness' testimony requires that he draw conclusions from the evidence presented

at trial.").  Under such circumstances, the agent will merely be "testifying as to his analysis of the transaction which may necessarily stem from the testimony of other witnesses."  Barnwell, 2017 WL 1063457, at *2.

Agents are not, however, "'permitted to opine on the credibility of other fact witnesses or in any way evaluate their testimony.'"  Barnwell, 2017 WL 1063457, at *2 (quoting United States v. Cadet, 2009 WL 2959606, at *4).  Furthermore, a summary witness for the government cannot, under Rule 701, tell the jury "what inferences to draw" from the evidence. United States v. Grinage, 390 F.3d 746, 750 (2d Cir. 2004) (holding that the agent's sweeping testimony interpreting both telephone calls the jury heard and ones they did not hear "went beyond permissible lay opinion testimony under Rule 701(b) because, rather than being helpful to the jury, it usurped the jury's function" to decide what to infer from the content of the calls).  It is also improper for the government's agent to "essentially tell[] the jury that he had concluded that [the defendant] was guilty of the crimes charged." Garcia, 413 F.3d at 210, 215.  A government agent's "role is to testify as a summary witness . . ., not to lend an aura of credibility to any lay opinion regarding Defendant's culpability." Barnwell, 2017 WL 1063457, at *3  (quoting United States v. Dukagjini, 326 F.3d 45, 53 (2d Cir. 2003)).

Expert witness testimony – "in the form of an opinion or otherwise" – is admissible pursuant to Rule 702 if the witness "is qualified as an expert by knowledge, skill, experience, training, or education" and "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." See Fed. R. Evid. 702.  Accordingly, where a law enforcement agent testifies both as a fact

witness and a qualified expert witness, "the government confers upon him the aura of special reliability and trustworthiness surrounding expert testimony, which ought to caution its use[;] . . . [t]his aura creates a risk of prejudice because the jury may infer that the agent's opinion about the criminal nature of the defendant's activity is based on knowledge of the defendant beyond the evidence at trial . . . ." Dukagjini, 326 F.3d at 53 (internal quotations and citations omitted) (where DEA case agent, who was also the government's expert on the use of code words in narcotics conversations, testified about the meaning of conversations in general, beyond the interpretation of code words and "summarize[d] his beliefs about the defendant's conduct based upon his knowledge of the case," his "dual roles as case agent and expert witness allowed him to [impermissibly] serve as a summary witness" with an "aura of special reliability and trustworthiness").

C.  Discussion

    The defendants' motion should be denied because it is premature and seeks to prevent the government from providing admissible summary testimony from law enforcement agents.  As an initial matter, the government does not intend at the upcoming trial to elicit testimony from any law enforcement agent that provides conclusions as to the charged criminal conduct or states inferences to be drawn from the admitted evidence.  Specifically, the government does not intend to elicit testimony describing specific wire transactions or payments as "bribes" or specific entities as "money-laundering intermediaries."  With those exceptions, however, the government does intend to elicit basic summary testimony from a law enforcement agent (or agents) similar to the testimony elicited from Special Agent Berryman in the 2017 trial.  Such summary testimony is proper, and the defendants' arguments to the contrary are baseless.

First, the defendants argue that law enforcement agents should be categorically precluded from testifying as both fact and expert witnesses.  Martinez Br. at 5-6.  Contrary to the defendants' assertion, see Martinez Br. at 2, the government did not qualify Special Agent Berryman as an expert at the 2017 trial and he did not provide expert testimony.  Likewise, the government does not anticipate seeking to qualify any agent who will testify at the upcoming trial as an expert.  Accordingly, the defendants' concern that the government's law enforcement witness will serve both as a fact witness and an expert witness will very likely be moot at the upcoming trial.  See Martinez Br. at 5-6.  In any event, regardless of whether the government qualifies the testifying agent at the upcoming trial as an expert, that agent's testimony will not pose the risk of prejudice about which the defendants are concerned – just as Special Agent Berryman's testimony did not pose such a risk.  Indeed, the government expects the agent principally to describe at a high level his background, including in connection with the investigation that gave rise to the pending charges; walk through previously admitted bank records, wire transactions, and ledgers; read from and briefly describe relevant entries; and note connections among the records.  Such summary testimony is entirely appropriate and poses no risk of the sort of prejudice the Second Circuit identified in Dukagjini, 326 F.3d at 53-54, where the agent went beyond his expert interpretation of code words to inappropriately "provid[e] an overall conclusion of criminal conduct" and thereby unfairly prejudiced the defendant.

The defendants also argue that the government's law enforcement agent(s) should be precluded from acting as a summary witness by "connecting" evidentiary materials.  Martinez Br. at 8-10.   The defendants contend that agents improperly "act as summary witnesses by connecting and harmonizing various pieces of admitted evidence, like bribery ledgers and bank statements, as Agent Berryman did at trial in 2017."  Id. at 9.  Specifically, the defendants assert

that "[w]hen an agent testifies that payments listed in bribery ledgers correspond with payments in bank records, the agent effectively asserts that it is an empirical fact that the payments in the bank records are the bribery payments listed in ledgers" and thereby "'displac[es] the jury by connecting and combining' evidentiary materials into a 'coherent, discernable, internally consistent picture.'" Id. (quoting United States v. Mejia, 545 F.3d 179, 190-91 (2d Cir. 2008)).

These assertions are meritless. As an initial matter, a witness reading portions of admitted exhibits into the record is commonplace – agents read emails, phone records, and other documents into the record as a matter of course; lawyers read stipulations. To the extent moving from one exhibit to another could be viewed as summary testimony, it falls well within the parameters of Rule 701. See Barnwell, 2017 WL 1063457, at *2-3.   At the 2017 trial, Special Agent Berryman merely read from or described payments in the previously admitted bank records and ledger entries to which the prosecutor directed him.   He did not "harmonize" evidence, assert as "an empirical fact" that payments in the records and on the ledgers were the same, or create some "picture" that displaced the jury's factfinding role.  Cf. Mejia, 545 F.3d at 195-96 ("The Government cannot take a shortcut around its obligation to prove murder beyond a reasonable doubt just by having an expert pronounce that unspecified deaths of eighteen to twenty-three persons have been homicides committed by members of MS–13.  [The agent's] testimony in this regard went beyond those issues on which his 'expert' testimony would have been helpful and appropriate.").

Special Agent Berryman's identification of entries in certain previously admitted bank records and bribery ledgers that on their face appear related was also not "needlessly cumulative and inadmissible under Fed. R. Evid. 403," as the defendants maintain. See Martinez Br. at 9.  Rather, an agent's description of apparently related entries in relevant records is

customary, helpful to the jury, and completely appropriate, whether he is testifying as a lay or expert witness.  See, e.g., Riglioni, 694 F. App'x at 16; Barnwell, 2017 WL 1063457, at *2-3; Dukagjini, 326 F.3d at 53.  Such agent testimony also does not raise the principal concerns – namely, urging inferences from the evidence or reaching conclusions about the defendant's culpability – that the Second Circuit has cited in holding certain summary testimony to be impermissible.  See, e.g., Grinage, 390 F.3d at 750; Garcia, 413 F.3d at 210-15.

Accordingly, the defendants' motion to preclude the government's agent from acting as a summary witness, including by "connecting" evidentiary materials, is meritless and should be denied.

## IV.   Defendant Full Play Group's Motion to Admit Evidence of Foreign Law Should be Denied

Full Play seeks to introduce expert testimony regarding the criminal laws of Argentina, Paraguay, and Uruguay as they purportedly relate to the conduct charged in this case. Such evidence should be precluded for the reasons set forth in the government's motion in limine (the "MIL") on this subject filed on January 1, 2021, see ECF Dkt. No. 1700, and for the further reasons addressed briefly here.  Full Play's arguments are meritless, and rest on misconceptions of the theory of the government's case and the relevant legal authorities.  Accordingly, the motion should be rejected in its entirety.

Full Play argues that if its conduct was not criminal under the laws of the specified countries, (1) it is less likely it intended to violate a duty in a manner that would expose it to criminal liability, and (2) it is more likely that "no duty existed between [Full Play] and [its] business partners that could have given rise to liability under Section 1346."  Mot. at 2.  The first argument is similar to those rejected by this Court during the first trial, by the Second Circuit in its opinion affirming the trial convictions, and, more recently, by this Court in its order dated

October 29, 2021, in which it denied the defendants' as-applied vagueness challenges to the honest services fraud charges in this case.  See ECF Dkt. No. 853 at 17-26; United States v. Napout, 963 F.3d 163, 185-87 (2d Cir. 2020) (affirming this Court's preclusion of foreign law evidence)[3]; United States v. Full Play Grp., S.A., No. 15-CR-252 (PKC), 2021 WL 5038765, at *8 (E.D.N.Y. Oct. 29, 2021).  It should be rejected again here, for the same reasons and those provided below. The second argument, to the extent it is not a reformulation of the first, is difficult to understand but appears to be a meritless attempt to relitigate the constitutional vagueness questions already decided in this case.

Full Play argues that its proffered expert testimony is relevant to establishing that the company had no criminal intent, stating that it is "crucial" to its defense that the company "acted in conformity with the laws that governed [its] relationships with [its] business partners in a foreign country."  Full Play Br. at 4.  To the extent Full Play argues that it did not understand it was violating a fiduciary duty because such a violation is not criminal in a particular country outside the United States, the argument fails for the reasons set forth in the rulings cited above and in the government's MIL.  This Court directly addressed this point during the first trial:  A defendant's "knowledge" of foreign law is "simply not relevant" as to whether the defendant "knowingly entered in a conspiracy to deprive . . . soccer organizations of the fiduciary duties

---

[3] To read Full Play's summary of the Second Circuit's opinion in Napout, one would think that the Circuit held that evidence of the sort Full Play seeks to admit here is both relevant and admissible.  See Full Play Br. at 3.  In fact, the Circuit held close to the opposite, affirming this Court's exclusion of foreign law evidence and reasoning that (1) there was an "at-best-tangential" relationship between the foreign law of commercial bribery and the U.S. charges at issue and (2) this Court reasonably determined that, "whatever minor probable value of the [defendants'] foreign law evidence may have had, it was 'substantially outweigh[ed]' by the risk that its introduction would cause the jury to be confused or inclined to vote not guilty simply because the [defendants'] conduct was not illegal in their home countries."  963 F.3d at 186-87 (citation omitted).

owed to those organizations."[4]   ECF Dkt. No. 853 at 20.   The government also need not "prove that [a defendant] entered into a conspiracy knowing that the objectives of the conspiracy were 'illegal'" under U.S. law (id. (citing, inter alia, United States v. Rybicki, 354 F.3d 124, 145 (2d Cir. 2003) (en banc))), because a holding to the contrary would run afoul of the "deeply rooted" American "rule that ignorance of the law or a mistake of law is no defense to criminal prosecution," Cheek v. United States, 498 U.S. 192, 199 (1991); see also United States v. Golitschek, 808 F.2d 195, 202 (2d Cir. 1986) (same).[5]

In the pending motion, Full Play appears to extend its argument beyond the status of its conduct under criminal law, stating that, "if the purported bribe-and-kickback scheme charged here under Section 1346 involved completely lawful 'bribes' or 'kickbacks,' the jury should be free to consider this in determining guilt in this matter."  Full Play Br. at 4 (emphasis in original).  But the experts Full Play proposes to call as witnesses have opined, in effect, that the company's alleged conduct was not completely lawful.  See Gov't MIL at 3, n.1 (summarizing Full Play's expert opinions on the existence of fiduciary-type duties in the specified countries). That is, the experts have opined that Argentina, Paraguay, and Uruguay each recognize duties of loyalty and trust similar to those owed by fiduciaries, which would seem to undercut the premise of Full Play's argument.

---

[4]   Full Play does not seriously dispute the risk of confusion and jury nullification created by such foreign-law evidence.  Full Play simply makes the conclusory assertion that the evidence is "not prejudicial."   See Full Play Br. 7.  Full Play entirely ignores this Court's (affirmed) explanation of the undue prejudice created by similar evidence that defendants from the first trial attempted to admit.  See ECF Dkt. No. 853 at 23-27; see also Fed. R. Evid. 403.

[5]   Because Full Play offers no evidence of actual reliance on any of the expert witness's understanding of foreign law, Full Play's analogy to an advice-of-counsel defense does not apply here.  See Full Play Br. 4.

The government is not sure it understands Full Play's secondary argument that "[e]xamining foreign law is also essential to demonstrate that FPG was not engaging in any unlawful act, as it may determine whether any alleged duty between FPG and their business partners could have given rise to liability under Section 1346." Full Play Br. at 4.  Based on the brief's citations to United States v. Skilling, 561 U.S. 358 (2010) and references to purported lack of notice, the government understands Full Play to seek reconsideration of this Court's ruling on vagueness challenges raised, and rejected, previously in this case.  The Court should deny any such request as untimely and meritless.

Full Play also cites to United States v. Pierce, 224 F.3d 158, 166 (2d Cir. 2000), and Pasquantino v. United States, 544 U.S. 349, 351 (2005).  Neither governs here.  The government in both cases needed to prove that the "object" of the respective frauds was "property" under 18 U.S.C. § 1343.  Kelly v. United States, 140 S. Ct. 1565, 1571 (2020) (citation omitted).  That property must be "in the victim's hands." Pasquantino, 544 U.S. at 355 (citation omitted).  The alleged object in both Pierce and Pasquantino was "money legally due" to the Canadian government.  Id. at 356.  The property analysis in both cases became inextricably tied to "incidental foreign law issues," id. at 370: the Canadian "tax scheme" in Pasquantino, id., and the "import duty" regime in Pierce, 224 F.3d at 166, which created the property interest at issue.  Here, the honest services owed by soccer officials to their employers do not turn on definitions provided under foreign law (although, as recognized by Full Play's experts, such obligations exist in the specified foreign jurisdictions as well).  As this Court correctly explained, the Second Circuit has "rejected the notion that honest-services fraud requires an underlying violation of local law." Full Play, 2021 WL 5038765, at *8 (citing Bahel, 662 F.3d at 633); see also United States v. Lemire, 720 F.2d 1327, 1335-36 (D.C. Cir. 1983) (noting prior "judicial consensus" that fiduciary duties

"may stem" not from federal or state law but rather "from an employment relationship of the sort that imposes discretion"). <u>Pasquantino</u> and <u>Pierce</u> do not suggest otherwise.

Finally, Full Play suggests that it has a constitutional right to present the foreign-law evidence.  <u>See</u> Full Play Br. at 4.  But the Constitution does not require admission of immaterial, marginally relevant, confusing, or prejudicial evidence.  <u>See</u> <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 679 (1986); <u>United States v. Percoco</u>, 13 F.4th 158, 178 (2d Cir. 2021).  Because Full Play cannot demonstrate the relevance of the proffered foreign-law evidence and makes no serious attempt at challenging this Court's prior Rule 403 balancing, the Court should deny Full Play's motion <u>in limine</u>.

CONCLUSION

For the foregoing reasons, the Court should defer ruling on the motion regarding racketeering evidence and should deny the remainder of the Defendants' motions <u>in limine</u>.

Dated:     Brooklyn, New York
           February 18, 2022

Respectfully submitted,

BREON PEACE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

By:     _____/s/_____

Samuel P. Nitze
Patrick T. Hein
Kaitlin T. Farrell
Victor A. Zapana
Assistant United States Attorneys
(718) 254-7000

24