KTF/VAZ/EWS
F. #2015R00747

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

FULL PLAY GROUP S.A.,
HERNAN LOPEZ, and
CARLOS MARTINEZ,

           Defendants.

S U P E R S E D I N G
I N D I C T M E N T

Cr. No. 15-252 (S-3) (PKC)
(T. 18, U.S.C., §§ 1343, 1349, 1956(h),
  2 and 3551 et seq.)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

THE GRAND JURY CHARGES:

INTRODUCTION TO ALL COUNTS

At all times relevant to this Superseding Indictment (the "Indictment"), unless otherwise indicated:

I.    Relevant Entities

    A.    FIFA

        1.    The Fédération Internationale de Football Association ("FIFA") was the international body governing organized soccer, commonly known outside the United States as football. FIFA was composed of more than 200 member associations, each representing organized soccer in a particular nation or territory, including the United States and four of its overseas territories—Puerto Rico, Guam, American Samoa and the United States Virgin Islands. At various times relevant to the Indictment, FIFA was headquartered

in Switzerland and also maintained offices elsewhere in the world, including in the United States.

2. Each of FIFA's member associations also was a member of one of the six continental confederations recognized by FIFA. Under FIFA's statutes, no national soccer association could become a member of FIFA without first joining one of the six continental confederations. Under FIFA's statutes, the six continental confederations had certain rights and obligations, including, among other things, that they comply with and enforce FIFA's statutes, regulations and decisions and work closely with FIFA to further FIFA's objectives and organize international soccer competitions.

3. FIFA's purpose was, among other things, to develop and promote the game of soccer globally by organizing international competitions and by creating and enforcing rules that govern the confederations and member associations. FIFA financed its efforts in significant part by commercializing the media and marketing rights associated with the World Cup and other international tournaments. FIFA's sponsors included major U.S.-based companies, which provided FIFA with a significant source of marketing revenue.

4. FIFA first instituted a written code of ethics in 2004, which code was revised in 2006, 2009 and 2012 (generally, the "code of ethics"). The code of ethics governed the conduct of soccer "officials," which expressly included, among others, various individuals with responsibilities within FIFA, the confederations, member associations, leagues and clubs. Among other things, the code of ethics provided that soccer officials were prohibited from accepting bribes or cash gifts and from otherwise abusing their positions for personal gain. The code of ethics further provided that soccer officials owed certain duties to

2

FIFA and its confederations and member associations, including a duty of absolute loyalty. By 2009, the code of ethics explicitly recognized that FIFA officials stand in a fiduciary relationship to FIFA and its constituent confederations, member associations, leagues and clubs.

### B. The Continental Confederations

5. In addition to providing representatives who helped to govern FIFA, the six continental confederations worked closely with FIFA and one another to organize international soccer competitions and carry out FIFA directives on a regional basis. The leaders and representatives of the confederations conducted business with one another, as well as with the leaders and associates of FIFA, throughout the year at locations around the world, including in the United States.

6. The Confederation of North, Central American and Caribbean Association Football ("CONCACAF") was a continental soccer confederation incorporated in the Bahamas. From approximately 1990 to 2012, CONCACAF's principal administrative office was located in New York, New York, where the former general secretary was based (until the end of 2011) and where CONCACAF regularly conducted business. Beginning in 2012, CONCACAF's principal administrative office was located in Miami, Florida, where the new general secretary was based. CONCACAF also conducted business at various times throughout the United States, including in the Eastern District of New York, as well as in foreign countries within and outside the confederation. CONCACAF comprised as many as 41 member associations, representing organized soccer in North America, Central America, the Caribbean and three South American countries. The United States and two of its

overseas territories, Puerto Rico and the United States Virgin Islands, were members of CONCACAF.  In 2014, CONCACAF adopted a code of ethics that, among other things, prohibited bribery and corruption.

       7.       The Confederación Sudamericana de Fútbol ("CONMEBOL") was a continental soccer confederation headquartered in Paraguay.  CONMEBOL comprised as many as 10 member associations, representing organized soccer in South America.  Among other tournaments, CONMEBOL organized the Copa América, featuring the men's national teams of its 10 members and non-CONMEBOL national teams invited to participate, as well as tournaments featuring the top men's club teams.  In 2016, the United States hosted and participated in a special edition of the tournament, the Copa América Centenario, to commemorate its centennial.  In 2013, CONMEBOL adopted a code of ethics that, among other things, prohibited bribery and corruption.

       8.       The Union des Associations Européennes de Football ("UEFA") was a continental soccer confederation headquartered in Switzerland that represented organized soccer in Europe and certain nations in the Middle East and Central Asia.  The Confédération Africaine de Football ("CAF") was a continental soccer confederation headquartered in Egypt that represented organized soccer in Africa.  The Asian Football Confederation ("AFC") was a continental soccer confederation headquartered in Malaysia that represented organized soccer in Asia, as well as the island of Guam, an overseas territory of the United States.  The Oceania Football Confederation ("OFC") was a continental soccer confederation headquartered in New Zealand that represented organized soccer in New Zealand and the

Pacific Island countries, including American Samoa, an overseas territory of the United States.

  9. The six confederations organized World Cup qualifying matches and other regional soccer events and, from time to time, worked together to organize inter-confederation competitions, often with the support and approval of FIFA.

  C. <u>The Regional Federations and National Associations</u>

  10. In addition to being members of FIFA and their respective continental confederations, some of the national associations were also members of smaller, regional federations.

  11. For example, CONCACAF's member associations were organized into three smaller regional federations: the Caribbean Football Union ("CFU"), the Central American Football Union ("UNCAF") and the North American Football Union ("NAFU"). The United States Soccer Federation ("USSF") was thus a member association of CONCACAF as well as NAFU, while Puerto Rico and the United States Virgin Islands were both members of CONCACAF and CFU.

  12. The national associations, also often referred to as "federations," promoted, organized and governed soccer, often including club-level soccer, within individual nations. The national association of the United States, the USSF, was based in Chicago, Illinois.

  13. The national associations also worked together to organize exhibition soccer matches between national and club teams, known as "friendlies." Friendlies took

place in venues throughout the United States, including the Eastern District of New York, as well as in other locations worldwide.

    D.    <u>The Sports Marketing Companies</u>

    14.    FIFA, the continental confederations, the regional federations and the national member associations often entered into contracts with sports marketing companies to commercialize the media and marketing rights to various soccer events, including the World Cup and other tournaments, World Cup and Olympic qualifiers, friendlies and other events, as well as other rights associated with the sport. Often operating in coordination with affiliated consultants and intermediaries, these sports marketing companies, including multinational corporations with headquarters, offices or affiliates located in the United States, often acquired an array of media and marketing rights, including television and radio broadcasting rights, advertising rights, sponsorship rights, licensing rights, hospitality rights and ticketing rights. These sports marketing companies often sold these rights to, among others, television and radio broadcast networks, sponsors and sub-licensees, including those located in the United States.

II.    <u>The Defendants</u>

    15.    The defendant FULL PLAY GROUP S.A. ("FULL PLAY") was a sports media and marketing business that was incorporated in Uruguay and operated from a principal office in Buenos Aires, Argentina. FULL PLAY had two shareholders, Hugo Jinkis and Mariano Jinkis, each of whom owned 50% of FULL PLAY.

    16.    At various times relevant to the Indictment, the defendant HERNAN LOPEZ, a citizen of the United States and Argentina, was the Chief Executive Officer of Fox

6

International Channels ("FIC"), a subsidiary of Twenty-First Century Fox, Inc. ("Fox") responsible for, among other things, developing Fox's sports broadcasting businesses in Latin America.

17. At various times relevant to the Indictment, the defendant CARLOS MARTINEZ, a citizen of the United States and Mexico, was the President of FIC, Latin America, and a high-ranking executive of Fox Latin American Channel, Inc., an affiliate of FIC that, among other things, developed and carried out aspects of Fox's sports broadcasting operations in Latin America.

III. Criminal Schemes

18. The defendants and their co-conspirators agreed to various criminal schemes involving the solicitation, offer, acceptance, payment and receipt of bribes and kickbacks in connection with the purchase and sale of media and marketing rights, including, but not limited to: the rights held by CONMEBOL for the Copa América and Copa Libertadores and the rights to World Cup qualifier matches and friendly matches held by certain national federation members of CONCACAF and CONMEBOL.

19. Set forth below are further details regarding certain criminal schemes in which the defendants and their co-conspirators agreed to engage.

A. Copa Libertadores Scheme

20. The television broadcasting rights to the Copa Libertadores were held, prior to 1999, by the individual teams that competed in the tournament. In or about 1999, CONMEBOL acquired and consolidated the broadcasting rights to the tournament to

maximize the collective value of the rights, ostensibly for the benefit of both CONMEBOL and the competing teams.

21. T&T Sports Marketing Ltd. ("T&T") began as a joint venture between Torneos y Competencias S.A. ("Torneos"), a sports media and marketing business based in Argentina, and Traffic Group ("Traffic"), a multinational sports marketing conglomerate based in Brazil. In or about and between 1999 and 2015, T&T acquired the exclusive worldwide broadcasting rights to each edition of the Copa Libertadores to be played through 2018 through a series of contracts between T&T and CONMEBOL. T&T was ultimately owned in part by Torneos and in part by other partners, including, in or about and between 2002 and 2015, Fox Pan American Sports ("FPAS"), a Delaware company headquartered in the United States that was, variously, a Fox affiliate and subsidiary.

22. At various times in or about and between 2005 and 2015, co-conspirator Alejandro Burzaco, who was a principal of Torneos, and the defendants FULL PLAY, HERNAN LOPEZ and CARLOS MARTINEZ, together with others, agreed to pay, did pay and facilitated the concealment of annual bribe and kickback payments to certain high-ranking CONMEBOL officials in exchange for the officials' support of T&T as the holder of the rights to the Copa Libertadores and other soccer events.

23. The defendants HERNAN LOPEZ and CARLOS MARTINEZ, together with others, relied on loyalty secured through the payment of bribes to certain CONMEBOL officials in connection with the Copa Libertadores to advance the business interests of Fox beyond the Copa Libertadores, including by obtaining confidential information from Co-Conspirator #1—who, at various times relevant to the Indictment, was

a high-ranking official of FIFA and CONMEBOL—regarding bidding for the rights to broadcast the 2018 and 2022 World Cup tournaments in the United States.

  B. <u>The CONMEBOL World Cup Qualifiers/Friendlies Scheme</u>

    24. In or about and between 2007 and 2015, the defendant FULL PLAY engaged in a scheme to pay bribes and kickbacks in connection with certain World Cup qualifying matches and certain friendly matches to the presidents of various soccer federations within CONMEBOL in exchange for the officials' support of FULL PLAY as the holder of the media rights to broadcast those and other soccer events.  The scheme included the payment of bribes and kickbacks to, among other soccer officials, Luis Bedoya, Carlos Chávez, Rafael Esquivel, Sergio Jadue and Juan Ángel Napout, as well as Luís Chiriboga.

  C. <u>Copa América Scheme</u>

    25. For many years leading up to and through 2011, Traffic held the media and marketing rights to each edition of the Copa América, a tournament featuring the men's national teams of CONMEBOL's member federations.  At various times during that period, Traffic, through its founder and owner José Hawilla and other conspirators, agreed to make and did make bribe payments to high-ranking CONMEBOL officials in exchange for continued official support of Traffic's position as exclusive holder of the media and marketing rights to the tournament.

    26. In or about 2010, CONMEBOL and the defendant FULL PLAY entered into an agreement pursuant to which FULL PLAY was designated as CONMEBOL's exclusive agent for the commercialization of the media and marketing rights to the 2015, 2019 and 2023 editions of the Copa América, among other tournaments.  The defendant

9

FULL PLAY, among others, agreed to pay bribes to various CONMEBOL officials in exchange for CONMEBOL's entry into the 2010 agreement with FULL PLAY.

27. Traffic, alleging that the 2010 agreement between CONMEBOL and the defendant FULL PLAY violated a contract between CONMEBOL and Traffic, filed a lawsuit in Florida state court against CONMEBOL, FULL PLAY and others. In the months preceding a 2013 settlement of that lawsuit, FULL PLAY (through Hugo Jinkis and Mariano Jinkis), Traffic (through José Hawilla) and Torneos (through Alejandro Burzaco) agreed that FULL PLAY, Traffic and Torneos would jointly acquire commercial rights to the Copa América in exchange for an agreement by Traffic to resolve the lawsuit. To this end, a new company, Datisa S.A. ("Datisa"), in which FULL PLAY, Traffic and Torneos each held a one-third interest, was created for the purpose of jointly obtaining and exploiting the commercial rights to the Copa América.

28. Datisa, through its shareholders the defendant FULL PLAY, Traffic and Torneos, later entered into a contract with CONMEBOL and FULL PLAY (the "2013 Copa América Contract"). Pursuant to the 2013 Copa América contract, Datisa obtained from CONMEBOL the exclusive worldwide media and marketing rights to the 2015, 2019 and 2023 editions of the tournament and to the Copa América Centenario, which was played in the United States in 2016, for a price of $317.5 million, and CONMEBOL and FULL PLAY assigned to Datisa the related contracts that had already been executed with third

10

parties. The contract was dated May 25, 2013 and signed by representatives of each of Datisa's three shareholders and 12 CONMEBOL officials.

29. The defendant FULL PLAY, along with, among others, José Hawilla and Alejandro Burzaco, agreed to pay tens of millions of dollars in bribes to CONMEBOL officials in connection with the 2013 Copa América Contract, including bribe payments for contract signature and for each of the four editions of the tournament covered by the contract.

30. The CONMEBOL officials who were promised and who received bribes in connection with the Copa América included Luis Bedoya, Carlos Chávez, Rafael Esquivel, Sergio Jadue, José Maria Marin, Juan Ángel Napout and Co-Conspirator #1, as well as Manuel Burga, Luís Chiriboga, Marco Polo Del Nero, Eugenio Figueredo, Ricardo Teixeira and José Luís Meiszner. In addition, the conspirators agreed to pay Jeffrey Webb, then president of CONCACAF, a bribe in exchange for Webb's agreement to cause CONCACAF, in its capacity as the co-organizer of the Copa América Centenario, to sell its rights related to the tournament to Datisa.

\* \* \* \*

31. In the course of the foregoing schemes, the defendants and their co-conspirators used wire facilities and financial institutions located in the United States, among other countries, to make and receive bribe payments and to transfer payments related to contracts secured through bribery. In the course of the schemes, the conspirators also relied on the growing U.S. market for soccer to generate profits from the schemes and conducted meetings in the United States in furtherance of the schemes.

11

32. No disclosure of any of the foregoing bribery and kickback schemes was made to FIFA, CONCACAF or CONMEBOL, including without limitation to their respective executive committees, congresses or constituent organizations.

COUNT ONE
(Wire Fraud Conspiracy – Copa Libertadores Scheme)

33. The allegations contained in paragraphs 1 through 32 are realleged and incorporated as if fully set forth in this paragraph.

34. In or about and between 2000 and 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants FULL PLAY, HERNAN LOPEZ, and CARLOS MARTINEZ, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA and CONMEBOL and their constituent organizations, including to deprive FIFA and CONMEBOL and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, to wit: wire transfers, telephone calls and emails, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

COUNT TWO
(Money Laundering Conspiracy – Copa Libertadores Scheme)

35. The allegations contained in paragraphs 1 through 32 are realleged and incorporated as if fully set forth in this paragraph.

12

36. In or about and between 2000 and 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants FULL PLAY, HERNAN LOPEZ, and CARLOS MARTINEZ, together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## COUNT THREE
(Wire Fraud Conspiracy – CONMEBOL World Cup Qualifiers/Friendlies Scheme)

37. The allegations contained in paragraphs 1 through 32 are realleged and incorporated as if fully set forth in this paragraph.

38. In or about and between 2009 and 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant FULL PLAY, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA and CONMEBOL and their constituent organizations, including to deprive FIFA and CONMEBOL and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings,

13

signs, signals, pictures and sounds, to wit: wire transfers, telephone calls and emails, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT FOUR
(Money Laundering Conspiracy – CONMEBOL World Cup Qualifiers/Friendlies Scheme)

39. The allegations contained in paragraphs 1 through 32 are realleged and incorporated as if fully set forth in this paragraph.

40. In or about and between 2009 and 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant FULL PLAY, together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## COUNT FIVE
(Wire Fraud Conspiracy – Copa América Scheme)

41. The allegations contained in paragraphs 1 through 32 are realleged and incorporated as if fully set forth in this paragraph.

42. In or about and between 2010 and 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant FULL PLAY, together with others, did knowingly and intentionally conspire to devise a scheme

14

and artifice to defraud FIFA, CONCACAF and CONMEBOL and their constituent organizations, including to deprive FIFA, CONCACAF and CONMEBOL and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, to wit: wire transfers, telephone calls and emails, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT SIX
(Money Laundering Conspiracy – Copa América Scheme)

43.    The allegations contained in paragraphs 1 through 32 are realleged and incorporated as if fully set forth in this paragraph.

44.    In or about and between 2010 and 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant FULL PLAY, together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

15