UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
UNITED STATES OF AMERICA,


                    - against -                          **MEMORANDUM & ORDER**
                                                         15-CR-252 (S-3) (PKC)

FULL PLAY GOUP, S.A., HERNÁN LOPEZ,
and CARLOS MARTINEZ,

                              Defendants.
--------------------------------------------------------x

PAMELA K. CHEN, United States District Judge:

      Defendants Hernán Lopez ("Lopez") and Carlos Martinez ("Martinez") (collectively

"Defendants") move for relief based on alleged omissions and inconsistencies in the testimony of

the prosecution's main witness, Alejandro Burzaco ("Burzaco").  Specifically, the parties assert

that Burzaco's testimony has materially changed between his pre-trial proffers with the

Government[1] and his direct and cross-examination during trial.  Accordingly, Defendants argue

that the Government has breached its *Brady*/*Giglio*, *Napue*,[2] and 3500 obligations[3] by failing to

---

[1] Pursuant to the Government's obligations under 18 U.S.C. § 3500, the prosecution produced, *inter alia*, all notes taken by Federal Bureau of Investigation ("FBI") Special Agents of witness proffers with Burzaco, frequently referred to as "302s," before trial started.  (Dkt. 1906, at 2 ("[C]onsistent with its § 3500 obligations, the government produced to the defendants 142 documents and 1 audio file related to Mr. Burzaco to date.  The government produced 119 of those documents more than nine months ago, on April 11, 2022.  All but two of the § 3500 documents were produced before the jury was sworn.").)

[2] *Napue v. Illinois*, 360 U.S. 264, 271 (1959) (establishing that a conviction obtained by the prosecution's knowing use of perjured testimony must be set aside "if there is any reasonable likelihood" that the false testimony could "have affected the judgment of the jury").

[3] Pursuant to 18 U.S.C. § 3500, also known as the Jencks Act, the Government must produce "any statement . . . of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified" after the witness has testified on direct examination.  18 U.S.C. § 3500(a), (e).

disclose or correct the alleged changes in Burzaco's testimony prior to trial.  As relief, Defendants seek curative jury instructions—and if the curative instructions are denied—a mistrial.  For the reasons set forth below, the Court denies Defendants' motions in their entirety.

## BACKGROUND

### I.    Procedural Background

On January 24, 2023, Martinez filed a motion alleging omissions and inconsistencies between Burzaco's direct testimony and his pre-trial 302s.  (Dkt. 1904.)  In particular, Martinez raised concerns about discrepancies in Burzaco's accounts for three events: (1) a meeting at Dean and Deluca with Martinez and Lopez ("the D&D Meeting"), (2) a January 9, 2012 email exchange with Martinez, and (3) a meeting at a sushi restaurant in Buenos Aires with Martinez ("the Buenos Aires Meeting").  (*Id.* at 6–8.)  Martinez argued that changes in Burzaco's testimony between his direct examination and his pre-trial 302s must constitute either (1) a *Brady* violation, because the Government knew about the inconsistencies ahead of time and failed to disclose them, or (2) a *Napue* violation, because the Government knew or should have known Burzaco's direct testimony was false when compared with his 302s.  (*Id.* at 6 ("Mr. Burzaco's [inconsistent statements are] significant to [the] degree that [] the government [needed] to act to avoid violating Mr. Martinez's constitutional rights[;] . . . the government needed to either take curative action under *Napue* to avoid sponsoring perjured testimony, or it needed to disclose to Mr. Martinez these powerfully impeaching statements under *Brady*."); *see also id.* at 9–11.)  As relief, Martinez sought "an evidentiary hearing to determine whether the government willfully or inadvertently withheld powerfully impeaching evidence."  (*Id.* at 10.)  Martinez's counsel further supplemented their written motion with an oral application the same day, adding that they were "entitled to a mistrial" under *Napue*.  (Tr. 1435:4–10.)

2

Also on January 24, 2023, Lopez made an oral application alleging *Brady*/*Giglio* violations because of the differences between Burzaco's direct testimony and the Government's 3500 material.  (Tr. 1412:12–1455:22.)  Lopez sought a curative instruction advising the jury that the Government failed to disclose material information and wanted the opportunity to cross-examine Burzaco on the substance of that curative instruction.  (Tr. 1422:13–1423:22 ("[W]e respectfully sub[mit] you should tell the jury that there was material information that impeaches Burzaco's credibility that the Government was obligated to disclose prior to trial and failed to do so. . . . And it's very important to our case, to our cross-examination of [Burzaco], to be able to elicit from him that there are certain facts that are important ultra[-]material facts in his testimony that are not memorialized anywhere in that stack of 3500.")  Furthermore, Lopez raised the possibility of moving for mistrial if such relief was denied.  (Tr. 1424:10–12 ("[If] we don't get [the relief we have requested], we may move for mistrial just to preserve it . . . But th[e] [curative jury instruction is] our initial ask.").)  That evening, as directed by the Court, Lopez supplemented his oral application with a chart submission, detailing the alleged omissions and discrepancies between Burzaco's direct testimony and his 302 statements.  (*See* Dkt. 1905.)

Later in the evening on January 24, 2023, the Government responded to Defendants' motions for relief under *Brady*/*Giglio*, *Napue*, and 3500, and denied violating any of its obligations under those doctrines.  (Dkt. 1906.)  The Government's submission included a modified version of Lopez's chart (Dkt. 1905), comparing Burzaco's trial testimony to the 302s and Government trial exhibits that were provided to Defendants before trial.  (Dkt. 1906)  The Government further supplemented their opposition to Defendant's motions on January 29, 2023.  (Dkt. 1909.)

On February 1, 2023, Lopez filed a letter brief "in further support" of his argument that the Court should "provide an instruction to the jury regarding the absence of . . . two critical meetings

3

in [the] 3500 material for Alejandro Burzaco." (Dkt. 1916, at 1.)  This time, Lopez grounded his

argument in "fairness concerns" and focused on two particular meetings: (1) a meeting in Fort

Lauderdale in February 2010, and (2) a meeting at NewsCorp's New York City office in May

2010.  (*Id.* at 5.)  Lopez asserted that both meetings were detailed by Burzaco during his direct

examination but were absent from his 302s.  (*Id.*)  Accordingly, Lopez asked the Court to give the

following curative instruction as relief, arguing that the instruction is "akin to asking the jury to

take notice of an adjudicative fact":

> The following facts do not appear in any interview reports prepared by government
> agents relating to meetings with Burzaco, or in his prior testimony: (i) reference to
> or any of the accompanying details regarding the February 2010 Fort Lauderdale
> meeting, during which Burzaco testified he first discussed bribery with Mr. Lopez;
> (ii) reference to or any of the accompanying details regarding the May 2010
> NewsCorp meeting, at which Burzaco testified that he first discussed the details of
> the bribery scheme with Mr. Lopez.

(*Id.* at 2.)

Lastly, on February 6, 2023, Martinez filed a letter brief asking to join Lopez's request for

a curative instruction.  (Dkt. 1920, at 1 (citing Dkt. 1916).)  In addition to the claims Martinez

made in his first brief (Dkt. 1904), Martinez added that the 3500 materials also did not mention

three offshore trust entities that held assets for Burzaco's children: Avalanche, Sargasso, and

Tornasol.  (*Id.* at 3.)  Specifically, Martinez asserted that there is a discrepancy between the

Burzaco 302s, which did not mention the three offshore trust entities, and Burzaco's cross-

examination testimony that "he discussed the money in the trusts" with the Government in "late

July 2015."  (Dkt. 1920, at 3 (citing Tr. 2911).)  Martinez argued that "it strains credulity that an

[FBI] agent would not take notes" regarding the off-shore trust entities "given the staggering

amounts of money at issue."  (Dkt. 1920, at 4.)  Thus, Martinez asserted, the Government must

have committed either a *Brady* violation by not disclosing 302s regarding the trust entities, or a

*Napue* violation by not correcting Burzaco's "lie" during cross-examination. (*Id.*)  Martinez

requested the following curative jury instruction as relief:

> The following facts do not appear in any interview reports prepared by government agents relating to meetings with Burzaco, or in his prior testimony: (i) reference to or any of the accompanying details regarding the February 2010 Fort Lauderdale meeting, during which Burzaco testified he first discussed bribery with Mr. Lopez; (ii) reference to or any of the accompanying details regarding the May 2010 NewsCorp meeting, at which Burzaco testified that he first discussed the details of the bribery scheme with Mr. Lopez; (iii) any specific reference to a meeting on January 10, 2012 wherein Mr. Burzaco explained to Mr. Martinez the three mechanisms used to run his bribery scheme; (iv) any mention of Sargasso, Avalanche, or Tornosol, the off-shore trust entities that hold approximately $114 million dollars in his children's name[s].

(*Id.* at 4.)[4]

---

[4] The Court finds Martinez's *Brady*/*Napue* claim regarding the three offshore entities to be meritless and thus denies Martinez's request to give a curative instruction about these entities.  The Government is not required to memorialize all details in witness interviews under the Jencks Act or *Brady* because "the Government's representative may have no way of knowing, upon hearing a witness's statement, that the statement is inconsistent with what the witness say at a later time." *United States v. Rodriguez*, 496 F.3d 221, 225 (2d Cir. 2007).  Thus, despite Martinez's assumptions to the contrary, it is entirely possible that Burzaco told the Government about the offshore entities but the Government did not write the account names down.  While the Government cannot avoid its *Brady* or *Giglio* obligations by not writing material information down, *id.* at 222, the Court does not find Burzaco's trial testimony regarding the offshore accounts to constitute "material" information under *Brady*/*Giglio*.  Specifically, information is "material" when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Madori*, 419. F.3d 159, 169 (2d Cir. 2005) (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987)).  Further, *Brady* only requires that "material" information be disclosed "in sufficient time [for] the defendant [to] have a reasonable opportunity to act upon the information efficaciously." *Rodriguez*, 496 F.3d at 226. Here, the fact that Burzaco had established trust accounts for family members—which the Government did not invade or seize—was fully explored during Burzaco's testimony in the 2017 trial, which Defendants received as 3500 material long before this trial began.  Martinez fails to explain how identifying the specific trust entities or accounts in the 3500 material would reasonably have altered the outcome of these proceedings—nor can the Court think of any.  In fact, Martinez's counsel cross-examined Burzaco at great length about the three offshore accounts and admitted financial statements pertaining to the accounts into evidence.  (Tr. 2906:1–2932:10 (questioning Burzaco about account's assets, trustees, and beneficiaries); Tr. 2934:4–2942:15 (same).)  Thus, the Court finds that regardless of whether information regarding the three offshore accounts meets the *Brady* materiality standard, Martinez's counsel had full opportunity to "efficaciously" use the information during trial.

## II.   Alleged Factual Inconsistencies and Omissions

There are four factual events at issue in Defendants' motions: (1) the February 2010 Fort

Lauderdale Meeting between Burzaco and Lopez; (2) the May 2010 NewsCorp Meeting between

Burzaco and Lopez; (3) the fall 2011 D&D Meeting between Burzaco, Lopez and Martinez; and

(4) the January 9, 2012 email exchange and subsequent Buenos Aires Meeting between Burzaco

and Martinez.   Below, the Court details the facts that Burzaco provided to the Government

regarding each event during his pre-trial meetings with them, as reflected in the 3500 material, and

compares them to his direct testimony.

### A.   February 2010 Fort Lauderdale Meeting

#### 1.   Government's 3500 Material

Burzaco's recollection of the first time he and Lopez discussed bribery varies throughout

the Government's 3500 material.   In a January 2019 proffer session, he "estimated that by 2009,

[Lopez] was aware" of the bribery scheme and "had already had multiple conversations with Lopez

involving the bribe payments."   (3500-AB-39(a) ¶ 7.)   Then in an October 2019 proffer session,

Burzaco recalled that it was after a "Los Angeles Awards ceremony in July or August 2010" that

he first discussed bribes explicitly with Lopez.   (3500-AB-43(a) ¶ 9.)   Furthermore, before trial,

Lopez's counsel told the Government that their understanding from the 3500 material was that

Burzaco's alleged first discussion with Lopez regarding bribery was during a summer 2010

meeting in Los Angeles.   (Tr. 1447:18–23.)   The Government appeared to agree.   (*Id.*)

#### 2.   Burzaco's Direct Testimony

On direct examination, Burzaco testified that the first time he and Lopez discussed bribery

was in February 2010, in a hotel lobby in Fort Lauderdale.[5]   (Dkt. 1916, at 2–3 (citing Tr. 651:9–

---

[5] The parties agree that the 3500 material does not reference or detail a meeting between
Burzaco and Lopez in Fort Lauderdale.   (Tr. 1508:25–1509:3.)   In fact, in response to questioning

11.)  Moreover, Burzaco explained that it was *Lopez* who raised the scheme and assured *Burzaco*
that he (Lopez) could be trusted with the details.  According to Burzaco, Lopez stated that he
"knew how things are done in the soccer world, in Latin America" and that "after [many] months
[of] analyzing [Fox Pan American Sports]," Lopez discerned that there was "some type of special
arrangement with [FIFA] executives."  (Tr. 652:1–23.)  Burzaco then confirmed for Lopez that
there was indeed a bribery scheme and detailed the countries and executives who were receiving
bribes.  (Tr. 653:2–5.)

### B.     May 2010 NewsCorp Meeting

#### 1.     Government's 3500 Material

The 3500 material references Burzaco's recollection that "[i]n 2010 and 2011, there were
conversations in Los Angeles and New York City" regarding bribes between him and Lopez.  (*See*
3500-AB-8(a), at 9.)  The Government also produced to the defense before trial Government
Exhibit 431, which are minutes for a Fox Pan American Sports ("FPAS") board meeting in New
York on May 5, 2010, reflecting both Burzaco's and Lopez's attendance at the meeting.  (Dkt.
1906-1, at 1 (citing GX 431).)

#### 2.     Burzaco's Direct Testimony

Burzaco testified during his direct examination that he and Lopez attended a "Board
meeting in New York" after which the two met in the NewsCorp building, and Burzaco further
informed Lopez "of how . . . the bribe payments [were] done."  (Tr. 653:18–654:18.)  In the

---

by the Court, lead prosecutor Kaitlin Farrell confirmed that the Government had never heard of
the meeting until Burzaco's direct testimony.  (Tr. 1510:9–17.)  However, as discussed *infra*, at
the February 9, 2023 video conference, Assistant U.S. Attorney Farrell clarified that she had meant
only that she and the other prosecutors were unaware of the Fort Lauderdale meeting before
Burzaco's testimony at trial.  Ms. Farrell could not confirm that Burzaco had never told anyone in
the Government about that meeting, despite the meeting not being memorialized in any of his 302s.

meeting, Burzaco elaborated on a number of topics related to the bribery scheme, including how bribes were made to "the group of six" and the history of the "fake contracts[.]"  (Tr. 654.)

### C.    Fall 2011 Dean and DeLuca Meeting

#### 1.    Government's 3500 Material

During Burzaco's proffers with the Government, he repeatedly discussed a meeting at Dean and DeLuca with Lopez and Martinez that occurred sometime between September and November 2011.  (Dkt. 1906-1, at 6–8.)  In fact, from 2015 through 2022, Burzaco discussed the D&D Meeting on at least seven different occasions with the Government.  (*See id.*)  Although, over the years, Burzaco's account regarding the timing and substance of the D&D Meeting varied, two points were consistent: (1) the meeting attendees discussed the need to move "dirty" contracts off of T&T Cayman's books *before* Fox International Channels ("FIC")  acquired FPAS, and (2) all attendees knew that T&T Cayman's "dirty" contracts consisted of three sham service contracts known as the "Lazaro contracts."[6]  (*Id.*)  Further, according to the 3500 material, the D&D Meeting was the first time Carlos Martinez explicitly learned of the bribery scheme.  (*Id.*)

#### 2.    Burzaco's Direct Testimony

On January 20, 2023, Burzaco testified on direct examination that the D&D Meeting occurred in November 2011 and that although "the subject of bribery c[a]me up" (Tr. 815:15–16), he did not recall discussing the scheme in detail and he did not recall explaining the Lazaro contracts—or any bribe payment mechanisms—to Martinez.  (Tr. 816:23–25 ("Q: What, if anything, did Mr. Martinez say?  A: I don't recall.  Now I don't recall the conversations with Mr.

---

[6] All parties agree that FIC signed off on the acquisition of FPAS on November 16, 2011, and the deal closed on December 16, 2011.  (Tr. 1467:9–11.)  Furthermore, Defendants assert that due diligence for the deal concluded long before the D&D Meeting allegedly occurred.  (Tr. 1467:11–16.)

Martinez.").)  Rather, on direct, the only substantive information Burzaco remembered discussing was that Lopez asked if there was "anything else within T&T Cayman that we need to tidy up *now that we have 100 percent of FPAS*," to which Burzaco responded that he would need time to think about it.  (Tr. 816:20–22 (emphasis added).)

### D.    January 9, 2012 Email and January 10, 2012 Buenos Aries Meeting

#### 1.    Government's 3500 Material

On January 9, 2012, Martinez sent Burzaco an email asking for a copy of the "contract between T&T and Globo for the broadcast of the games of the Copa Lib[ertadores.]"  (GX1886, GX1886-T.)  When the Government showed this email to Burzaco in a January 2019 proffer, Burzaco recalled that he "found it odd that Martinez would be asking for the Globo contract" because "Martinez [already] knew that the Globo contract was involved in the bribe payments" by that time.  (Dkt. 1906-1, at 9 (citing 3500-AB-39(a)).)  Nine months later, at an October 2019 proffer session, Burzaco theorized that Martinez may have been asking for the Globo contract "to get information for his personal/political benefit."  (Dkt. 1906-1, at 9 (citing 3500-AB-43(a)).)  However, in a January 2020 proffer session, Burzaco backtracked and thought "it was possible that Martinez did not know" that the Globo contract was part of the bribery scheme when Martinez sent the January 9, 2012 email.  (3500-AB-44(a) ¶ 5.)

Furthermore, in the same email exchange, Burzaco responded to Martinez's request for the Globo contract with the following: "[t]omorrow [1/10/2012] we will talk about it personally in [Buenos Aires].  I talked about everything related to TyT and Globo in detail a couple of years ago with [Lopez].  There are very sensitive aspects and I believe it is best to talk about it tomorrow

morning alone[.]" (GX1886-T.)[7]  During Burzaco's January 2020 proffer session, the Government

showed him his calendar entry for the meeting with Martinez on January 10, 2012, but Burzaco

reported that the meeting "did not stand out to [him] because he had multiple meetings [in 2012] .

. . with Martinez to discuss how to deal with bribes."  (Dkt. 1906-1, at 10 (citing 3500-AB-44(a)

¶ 10).)

### 2.   Burzaco's Direct Testimony

During Burzaco's direct testimony, the Government presented him with the same January

9, 2012 email exchange shown to him during his proffer sessions.  (Tr. 845.)  In contrast to his

302s, Burzaco testified that he believed that Martinez was requesting the Globo contract so that he

could understand T&T Netherlands's profit margin on the sale of the free-to-air rights to Globo

for the purpose of renegotiating the contract and lowering Torneos's profit margin.  (Tr. 849:4–

15.)

Furthermore, Burzaco explained that the first time Martinez learned about the details of the

bribery scheme was on January 10, 2012, at Restaurant M, "a sushi restaurant, a half block from

Torneos."[8]  (Dkt. 1906-1, at 9 (citing Tr. 854:7–875:15).)  Burzaco testified that during the lunch,

he "explained to Carlos Martinez the three mechanisms that were in place for the [bribery]

arrangement," including the Lazaro and Globo contracts.  (Id.)

---

[7] Defendants received a copy of this email, along with the Government's other exhibits, prior to trial.

[8] However, on cross-examination, Burzaco revised his testimony about the location of the meeting being the sushi restaurant, but still maintained that the date and substance of the meeting were correct.  (Tr. 3019:20–3022:8 ("Q: Well, on direct examination you said you went to a restaurant near Torneos? . . . [A]nd you went over the three [bribery] mechanisms with Carlos Martinez? A: Yeah, that was incorrect. . . . I cannot re[member] now where [] this meeting [was on] January 10th, if it was either in my office or at the lunch. . . . Regarding this meeting, I confirm everything that we['ve] discuss[ed], but I don't remember if we discuss[ed] it at my office or at . . . the sushi restaurant.").)

## DISCUSSION

The Court denies Defendants' requests for curative jury instructions and mistrial because it does not find that the Government has committed *Brady*/*Giglio* or *Napue* violations. The Court also finds that the Government has fully complied with its 3500 obligations. Consequently, any fairness concerns raised by discrepancies between Burzaco's trial testimony and his 302s are properly addressed by allowing the Defendants to cross-examine Burzaco—as they have already done at length—and call the FBI agents who wrote the 302s to testify about all omissions and inconsistencies.

## I.      The Government Did Not Commit *Brady*/*Giglio* Violations

### A.      Legal Standard

The government has a duty to disclose all material evidence favorable to a criminal defendant. *United States v. Madori*, 419 F.3d 159, 169 (2d Cir. 2005) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). Further, the "government's duty to disclose is not limited to 'exculpatory' information, it also includes information that could be used to impeach government witnesses[.]" *Id.* (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)); *see also id.* at 170 ("Impeachment evidence is evidence 'having the potential to alter the jury's assessment of the credibility of a significant prosecution witness.'") (quoting *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998)). A *Brady*/*Giglio* violation is comprised of three elements: (1) the Government either willfully or inadvertently suppressed the material information, (2) the information is material "because it is exculpatory, or because it is impeaching[,]" (3) and as a result, the Defendant is prejudiced. *Id.* at 169 (citation omitted); *see also United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001).

11

First, information is "suppressed" when a prosecutor, whether in good or bad faith, fails to disclose "*known*, favorable evidence rising to a material level." *Kyles v. Whitley*, 514 U.S. 419, 437–38 (1995) (emphasis added).

Second, evidence is "material" "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Madori*, 419 F.3d at 169 (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987)). Materiality is a "result-affecting" test, requiring the prosecutor to predict whether nondisclosure of a certain piece of information would alter the proceeding's outcome, *not* "an evidentiary test of materiality that can be applied rather easily to any item of evidence ([*i.e.*,] would this evidence have some tendency to undermine proof of guilt?)[.]" *Coppa*, 267 F.3d at 142. Moreover, with respect to *Giglio* impeachment evidence, the information is not material "when the testimony of the [government's] witness is corroborated by other testimony, or when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." *United States v. Hunter*, 32 F.4th 22, 34 (2d Cir. 2022) (quoting *United States v. Payne*, 63 F.3d 1200, 1210 (2d Cir. 1995)) (finding government's withholding of impeachment evidence did not warrant a new trial because the parties' cross-examination of the government witness revealed that the witness had committed "a host of deceitful and manipulative acts, including . . . bribing multiple foreign authorities").

Third, when analyzing prejudice, the Court should consider the timing of the Government's disclosure and whether Defendants had a "reasonable opportunity either to use the evidence in the trial or to use the information to obtain evidence for use in the trial." *United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007); *see also Leka v. Portuondo*, 257 F.3d 89, 101 (2d Cir. 2001)

12

(noting when "disclosure is first made on the eve of trial, or when trial is under way, the opportunity to use it may be impaired").

###### B.     Analysis

The Court does not find that the Government has committed *Brady*/*Giglio* violations with respect to the complained-of portions in Burzaco's trial testimony for three reasons. First, the Government did not possess, and thus did not suppress, the Fort Lauderdale meeting between Burzaco and Lopez.  Second, the information about the NewsCorp meeting between Burzaco and Lopez was not impeachment evidence and thus not material.  Third, the differences between Burzaco's trial testimony and his 302 statements about (i) the D&D Meeting between Burzaco and both Defendants, (ii) the January 9, 2012 email between Martinez and Burzaco, and (iii) the January 10, 2012 Buenos Aires Meeting between Burzaco and Martinez amounted to cumulative impeachment and thus were not material.

###### 1.     The Government Did Not Suppress Information Regarding the Fort Lauderdale Meeting

The Court cannot find that the Government suppressed information regarding Burzaco and Lopez's meeting in Fort Lauderdale.  There is nothing in the current record, including Burzaco's voluminous 3500 material, indicating or even suggesting that the Government possessed this information before trial.  The first element of a *Brady*/*Giglio* violation is that the Government willfully or inadvertently suppressed information.  *Coppa*, 267 F.3d at 140.  Here, over 100 sets of 302s were produced of the Government's meetings with Burzaco over the course of 8 years (Dkt. 1906, at 2), and there are no 302s that mention the February 2010 Fort Lauderdale meeting about which Burzaco testified, or any meeting between Burzaco and Lopez in Fort Lauderdale. (*See* Tr. 1508:25–1509:3 ("THE COURT: Let me ask you a question . . . something like the Fort Lauderdale meeting and the details of that, I think no one disagrees that that wasn't in any 302[?]

MS. FARRELL: Correct.").)  In further response to the Court's questions, the Government stated

that Burzaco never told the Government about the Fort Lauderdale meeting.  (*See* Tr. 1510:9–13

("THE COURT: [B]ut is it the first time you've heard [Burzaco] say, yes, the meeting happened

at the Super Bowl in Fort Lauderdale at a particular hotel?  MS. FARRELL: It's the first time that

he has said the first time we discussed bribes was at this [Fort Lauderdale] meeting . . .  on the

stand was the first time he said to me, I recall this being the first instance.").)[9]  Thus, Defendants

fail to establish that the Government suppressed information regarding the Fort Lauderdale

meeting in violation of its *Brady*/*Giglio* obligations and the Court accordingly denies Defendants'

request for a curative jury instruction or a mistrial based on testimony about that meeting.[10]  As

---

[9] As discussed *supra* note 5, the Government subsequently explained at a February 9, 2023 video conference that it could not rule out the possibility that Burzaco had discussed the Fort Lauderdale meeting at a proffer session with prosecutors and the FBI, but that that information was not memorialized in a 302.  At the same conference, the Government further maintained that it had no duty to determine whether this ever happened.  The Court disagrees.  *See Strickler v. Greene*, 527 U.S. 263, 281 (1999) ("In order to comply with *Brady*, therefore, 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in [a] case, including the police.'" (citing *Kyles*, 514 U.S. at 437)); *Coppa*, 267 F.3d at 140 ("A prosecutor can suppress evidence even if he has acted in good faith and even if the evidence is known only to" other Government agencies/investigators, but "not to the prosecutor." (citations and internal quotation marks omitted)).  If the Fort Lauderdale meeting was material, then the Government had a duty to learn and disclose the information.  However, as discussed *infra*, the Court does not find a *Brady*/*Giglio* violation with respect to this information because the Fort Lauderdale meeting is cumulative impeachment material and thus does not meet the *Brady* materiality standard.

[10] Furthermore, even if the Government did possess the information regarding the Fort Lauderdale meeting, the Court finds that the information is cumulative and thus not material.  *See United States v. Persico*, 645 F.3d 85, 111 (2d Cir. 2011) ("[W]here the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable . . .  the undisclosed evidence may properly be viewed as cumulative, and hence not material[.]"); *see also United States v. Danilovich*, 731 F. App'x 45, 49 (2d Cir. 2018) (finding that the government's pre-trial failure to disclose its visit and phone calls to the cooperating witness was not material because "[t]here is no basis in the record to suggest that this information had or could have had any additional impeachment value in light of the fact that the Government had produced all of its interview reports and notes for [the cooperating witness], as well as the proffer and cooperation agreements").

mentioned, Defendants have had ample opportunity—which they have taken full advantage of—to cross-examine Burzaco about this prior omission.  Moreover, Defendants have the opportunity to call FBI agents to testify about that omission, which will serve to impeach Burzaco's claim that he told the Government about the Fort Lauderdale meeting and its details.[11]  (Tr. 2022:25–2023:11, Tr. 2026:5–14.)

### 2.   The NewsCorp Meeting was Not Impeachment Evidence and Thus Not Material

The Court finds that the details of the NewsCorp meeting between Burzaco and Lopez, which were not reflected in the Government's 3500 material,[12] did not constitute "material" information under the *Brady*/*Giglio* standard.  Lopez asserts that the "meeting in New York at the NewsCorp building" and the accompanying facts are "entirely missing from the 3500 material" and Burzaco's testimony regarding the meeting "amounts to a completely new story."  (Dkt. 1916, at 4.)  First, this is not fully accurate.  Burzaco's 3500 material *does* contain a reference to meetings between Burzaco and Lopez "[i]n 2010 and 2011 . . . in Los Angeles and New York City" during which the two men discussed bribes.  (*See* 3500-AB-8(a), at 9.)  Second, to successfully allege a *Brady*/*Giglio* violation, Lopez must show more than mere suppression or non-disclosure of

---

[11] The Government has prepared an FBI agent as a summary witness, who has reviewed all of Burzaco's 302s and can testify about the absence of statements in those 302s.  (February 9, 2023 Video Conference.)  Regarding prior inconsistent statements in the 302s, the Government indicates that there are three agents who, between them, were present at all of Burzaco's meetings with the Government and who are available to testify regarding the notes they took of the meetings.  (Dkt. 1909, at 12 n.11 ("Agents Lantier and Mendoza are in the courtroom each day of trial. Agent Randell is in Washington, D.C., but is available to travel to New York to testify, with the exception of February 15 to 20, when he will be outside the United States.").)

[12] Although the NewsCorp meeting is not specifically referenced in the 302s, the Court assumes for purposes of Lopez's motion—and the Government does not dispute this in its opposition (*see* Dkt. 1906-1, at 1)—that the Government was aware before trial that Burzaco was going to testify about the meeting at trial.

information.  *Coppa*, 267 F.3d at 135 ("*Brady* does not, however, require the prosecution to disclose *all* exculpatory and impeachment material." (emphasis in original)).  Rather, Lopez must establish that the NewsCorp meeting details are "material" information because they either exculpate Lopez or impeach Burzaco.  *See id.* at 140.

On direct, Burzaco testified that he and Lopez met in a "meeting room or office [at] night in the Fox building" and that they discussed the bribery scheme in detail, including the "fake contracts" and "hik[ing] the price in order to send [bribe] money to CONMEBOL and CONMEBOL to Jinkis for [the] group of six."  (Tr. 653:25–654:18.)  The Court is not aware of, and Lopez has not pointed to, other testimony Burzaco has given that contradicts this account.[13] Thus, these details from Burzaco's direct about the NewsCorp meeting are not material because they do not impeach Burzaco or exculpate Lopez.[14]  *Coppa*, 267 F.3d at 140; *see also Madori*, 419

---

[13] Additionally, the Court notes that there is some authority parsing when testimony that contains greater detail qualifies as an "inconsistent statement" for the purposes of impeaching a witness.  *See Arroyo v. Lee*, 831 F. Supp. 2d 750, 765 (S.D.N.Y. 2011) (holding that facts that "merely augment" witness statements given during pre-trial interviews were not sufficiently inconsistent to constitute impeachment information) (quoting *United States v. Leonardi*, 623 F. 2d 746, 756 (2d Cir. 1980)); *see also McCrary v. Artuz*, No. 95-CV-622 (RJD), 1995 WL 728423, at *3 (E.D.N.Y. Nov. 28, 1995) ("Testifying in greater detail is not inconsistent.").  Although these cases mostly pertain to the issue of when inconsistent statements constitute proper impeachment evidence in the context of the Federal Rules of Evidence, the Court notes that they may have some bearing on what constitutes "impeaching" information in the context of the *Giglio* standard as well.  *See Giglio*, 405 U.S. at 154 ("A government's duty to disclose is not limited to 'exculpatory' information, it also includes information that could be used to impeach government witnesses[.]").

[14] Furthermore, even if the NewsCorp meeting is impeaching evidence against Burzaco, the Court finds it is cumulative of other impeachment evidence available to Defendants and thus not material.  *See Persico*, 645 F.3d at 111 ("[W]here the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable . . .  the undisclosed evidence may properly be viewed as cumulative, and hence not material."); *see also Danilovich*, 731 F. App'x at 49 (finding that Government's failure to disclose a visit and phone calls to cooperating witness pre-trial were not material because "there is no basis in the record to suggest that this information had or could have had any additional impeachment value in light of the fact that the Government had produced all of its interview reports and notes for [the cooperating witness], as well as the proffer and cooperation agreements").

F.3d at 169 ("Impeachment evidence is evidence 'having the potential to alter the jury's assessment of the credibility of a significant prosecution witness.'"  (citing *Avellino*, 136 F.3d at 255)).

The Court does not find the NewsCorp meeting and its details to be "material" *Brady/Giglio* information and therefore denies Defendants' request for relief pursuant to its alleged lack of disclosure.  The Court again notes that Lopez has had, and taken full advantage of, the opportunity to cross-examine Burzaco about the absence of details regarding the NewsCorp meeting in Burzaco's 302s.  Lopez's counsel will also be able to call the FBI summary witness or any of the three FBI agents to corroborate Burzaco's omission and impeach Burzaco's claim that he told the Government about that meeting.  (Tr. 2022:25–2023:11, Tr. 2026:5–14.)

### 3.   Burzaco's Changed Testimony About the D&D Meeting, the January 9, 2012 Email Exchange, and the Buenos Aires Meeting are Cumulative and Thus Not Material

Finally, the Court addresses what it perceives to be Defendants' strongest argument for finding any of the changes in Burzaco's testimony material: the D&D Meeting, which featured prominently in Lopez's and Martinez's opening statements.  As an initial matter, it was Defendants' own strategic decision to focus so heavily on Burzaco's *anticipated* testimony about this meeting in their opening statements.  The fact that Defendants' expectations did not come to pass does not make the substance of that testimony material.[15]  As the Court noted in response to the Government's contemporaneous objection regarding Defendants' extensive references to 302 material in their openings, this was a strategic decision that Defendants made at their peril, because a witness's testimony often does not come out as expected.  (*See* Tr. 199:3–200:3 (The Court

---

[15] As the Court previously noted, *see supra* notes 10, 14, the changes from Burzaco's prior statements about the D&D Meeting certainly constitute potential impeachment evidence, but that in itself does not make this information material.  *See Persico*, 645 F.3d at 111 (explaining that when "undisclosed evidence merely furnishes an additional basis" to impeach, that evidence is "cumulative" and "not material"); *see also Danilovich*, 731 F. App'x at 49.

warning Defendants that their repeated characterizations of 302 material as factual evidence violated the appropriate bounds of opening statements: "THE COURT: You don't know [that 302 statements] will [come in as evidence in trial]. That's the problem. It's in the 302 so maybe you'll try to impeach—. MR. McCOOL [Martinez's Counsel]: I'll call the [FBI] agent if [Burzaco] doesn't [ultimately] say [the 302 statements]. THE COURT: You don't know if the agent is going to say that's exactly what [Burzaco] said. You're playing a little bit with fire . . . the line between opening and closing has[] been crossed by a football field length . . . but I would like you to move on from here and I'm going to caution the jury that the [302] evidence doesn't come in the way it's being argued or summarized in the opening statement."); *see also* Tr. 199:22–200:3 (responding to the Court's admonition about asserting 302 material as if it is factual evidence in an opening statement: "MR. McCOOL [Martinez's counsel]: Respectfully, I disagree. That's my oration style[;] . . . I'm telling them what the evidence is going to show. THE COURT: "That is the problem. This is a 302. The question is[,] is the live witness [Burzaco] going to say that and I think you're crossing the line on what evidence is.").)

a.  Defendants Have Ample Non-3500 Impeaching Evidence Against Burzaco

Martinez alleges that "anyone familiar with the case would have known that Burzaco's new story" regarding "the Dean and De[L]uca meeting, the January 9, 2012 email, and invent[ed] private lunch meeting in Buenos Aires[;]" "had considerable impeachment value to the defense."[16]

---

[16] The Court notes that Defendants assert that many—if not all—of the changed details in Burzaco's testimony are impeachment evidence, including whether the Buenos Aires Meeting occurred at a sushi restaurant or elsewhere. *See* Alleged Factual Inconsistencies and Omissions *supra* Sections II.C, II.D. But the Court does not agree that every discrepancy in a witness's testimony recounting events from a decade ago has the potential to alter the jury's assessment of his credibility. Rather, the Court finds that only two inconsistencies in Burzaco's testimony qualify as impeachment evidence: (1) Burzaco's changed testimony regarding whether he believed FIC's acquisition of FPAS was completed by the time of the D&D Meeting, and (2) Burzaco's

(Dkt. 1904-1, at 11.)  The Court finds, however, that to the extent the changed details constitute impeachment evidence, the evidence is cumulative of other impeachment information—substantial in volume and weight—already available to Defendants, and thus is not material.

"Impeachment evidence is evidence 'having the potential to alter the jury's assessment of the credibility of a significant prosecution witness.'"  *Madori*, 419 F.3d at 169 (citing *Avellino*, 136 F.3d at 255).  However, impeachment evidence is *not* material "when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable.'"  *Hunter*, 32 F.4th at 34.  That is, impeachment evidence is not material when it is cumulative.  *See id.* ("[I]mpeachment based on withheld information would have been cumulative." (citing *Avellino*, 136 F.3d at 257 ("[U]ndisclosed evidence may be cumulative, and hence not material."));  *see also United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993) (finding that additional impeachment evidence, although incendiary, was not material under the *Brady* standard because "[the Government's witness] had already confessed to numerous crimes . . . and was subject to withering cross examination for those actions" and thus  "[t]he addition of a few more allegations [about three previously undisclosed murders and the undisclosed disposal of a body] would not have materially affected the defense's cross examination of him").

Here, Defendants have myriad, non-3500 information with which to impeach Burzaco's overall credibility—including Burzaco's guilty plea to racketeering, his antagonistic relationship

---

inconsistent testimony about whether Martinez, at the time of his January 9, 2012 email, knew that the Globo contract was part of the bribery scheme.  The Court bases this decision, in part, on the fact that Defendants chose to focus on the D&D Meeting and January 9, 2012 email exchange in their opening statements.  (*See* Tr. 1416–1417, Tr. 1434.)  However, for the reasons stated herein, although the Court finds that Burzaco's discrepancies related to the two events are impeachment evidence—they do not meet the materiality standard under *Brady*/*Giglio*.

with Martinez (*see* MX 1556-T (Burzaco referencing his desire to "crack" Martinez)), the abundant assets Burzaco has managed to keep in trusts for his children, and the suspicious circumstances surrounding Burzaco's Blackberry getting wiped— indeed, all three Defendants in this case made efficacious use of such evidence in their combined six days of cross-examinations of Burzaco.  (*See, e.g.*, Tr. 1624:20–1625:3 ("Q [from Lopez's counsel]: Mr. Burzaco, you pled guilty to racketeering and cheating in business for more than ten years[;] right?"), Tr. 2682:13–15 ("Q [from Martinez's counsel]: Now, you pled guilty to a racketeering enterprise; is that right?  A: Correct."), Tr. 3235:12–14 (cross-examining Burzaco about an email in which he described Martinez as "ungrateful and false"), Tr. 3339:2–3 ("MR. SARRATT: . . . Has the Government taken even a single penny from those [trust] accounts where you transferred $114 million in 2014 [for your children]?"), Tr. 2340:7–2342:3 (Full Play Group's counsel questioning Burzaco about his Blackberry's whereabouts between the time Burzaco fled to Italy and his decision to turn the phone over to the Government).)  Indeed, here, unusually, all three Defendants in this case also had the benefit of Burzaco's extensive testimony during the 2017 trial, during which he was vigorously cross-examined about virtually all of the same subjects relating to his credibility.

> b.  Defendants Already Have Cumulative Impeachment Evidence in the 302s Regarding the D&D Meeting; January 9, 2012 Email Exchange; and Buenos Aires Meeting

Defendants' claim of materiality is grounded in the fact that Burzaco's expected testimony about the substance and timing of the D&D Meeting was demonstrably false and thus he could not be believed at all in this matter.  (*See, e.g.*, Tr. 205:2–6 (Martinez's counsel asserting in his opening statement: "Now, the evidence . . . is going to show that this Dean & De[L]uca meeting apparently took place in September/October of 2011, right?"; Tr. 141:11–15 (Lopez's counsel arguing in his opening: "[Burzaco]'s going to tell you about a conversation . . . Burzaco will say that he had a

conversation at a Dean & DeLuca near Rockefeller Center with Hernan and Carlos.  That did not

happen.").)  However, with the benefit of three weeks of trial testimony and evidence having been

presented, *see Coppa*, 267 F.3d at 142 (explaining that materiality is a "result-affecting" test,

requiring the prosecutor to predict whether nondisclosure of a certain piece of information would

alter the proceeding's outcome), the Court finds that the variances between Burzaco's prior

statements and his trial testimony about the D&D Meeting do not meet the *Brady*/*Giglio*

materiality standard.[17]  While the Court recognizes that Burzaco's testimony is an important part

of the Government's case against both Defendants, his testimony about that particular meeting is

not.[18]  Rather, it is but one of many meetings, conversations, and other communications with

Defendants about the bribery scheme over the course of several years, about which Burzaco

provided information to the Government and testified about at trial.  That the D&D Meeting was

the first meeting at which Martinez was introduced to the scheme does not materially distinguish

it from the rest.  *See Madori*, 419 F.3d at 169 (evidence is "material "if there is a reasonable

---

[17] By referencing this "backward-looking" approach, the Court is not suggesting that the Government had no obligation to disclose the changes in Burzaco's testimony as soon as they knew about them if the changes, in fact, were material to the defense.

[18] *See Giglio*, 405 U.S. at 154–55 (remanding for new trial where government's case depended "almost entirely" on a witness as to whom impeaching evidence was not disclosed); *United States v. Sperling*, 506 F.2d 1323, 1334–40 (2d Cir.1974) (remanding for new trial of those defendants as to whom the key witness's testimony was uncorroborated, while affirming as to defendants as to whom there was corroboration).  Here, however, the Court notes that Burzaco's testimony is not the Government's only evidence of Lopez's and Martinez's involvement in the charged bribery scheme—the Government has also introduced emails, calendar entries, and contracts.  Furthermore, the Government has given notice that it will introduce expert testimony to establish the patently underpriced Copa Libertadores media contracts and the alleged illogical financial structure of the Lazaro contracts.  *See Jackson v. Senkowski*, No. 03-CV-1965 (JG), 2007 WL 2275848, at *11 (E.D.N.Y. Aug. 7, 2007) (finding that impeachment evidence is "not unambiguously material" when the witness's testimony is not "the only evidence linking the defendant to the crime[.]") (quoting *Avellino*, 136 F.3d at 256)).

probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different").[19]

Here, Defendants did receive multiple 302s alerting them to discrepancies and changes in Burzaco's recollection about the D&D Meeting and the subsequent January 9, 2012 email exchange, including as to the timing.  (*Compare* 3500-AB-8-(a) (July 2015 302) (recalling that the meeting was in September or October 2011) *with* 3500-AB-43(a) (October 2019 302) (not remembering whether the meeting was before or after January 9, 2012) *and* 3500-AB-51(a) (November 2021 302) (recalling that the D&D meeting occurred around November 3, 2011 but not being "100% sure on the timing"); *compare also* 3500-AB-39(a) (stating Burzaco believed Martinez knew that the Globo contract was a part of the bribery scheme at the time of the January 9, 2012 email) *with* 3500-AB-44(a) (stating Burzaco no longer recalled whether Martinez knew about the Globo contract at the time of the email), *compare also* 3500-AB-8(a) (memorializing Burzaco's belief that he and Defendants moved the Lazaro contracts to T&T Netherlands in 2011) *with* 3500-AB-39(a) (memorializing Burzaco's belief that he and Defendants moved the Lazaro contracts to T&T Netherlands in 2009).)  Thus, Burzaco's credibility regarding the events at issue does not hinge on the allegedly suppressed impeachment evidence for either Defendant.

Burzaco's uncertainty about the timing of the meeting, in turn, signaled the possibility that he might also recall the substance of the meeting differently, especially as it related to the timing

---

[19] The Court notes that Lopez similarly argues that the Fort Lauderdale meeting about which Lopez testified for the first time at trial was material, in part, because it was the first meeting where bribes were discussed.  (Tr. 1447:9–1448:4 (Lopez's counsel explaining that the Fort Lauderdale meeting was important because it was the "first discussion of the bribes" and that "it was [Lopez] who pulled Burzaco aside and specifically asked to be told about the bribery scheme").)  Although the Court bases its finding that there is no *Brady/Giglio* violation regarding the Fort Lauderdale meeting on the absence of suppression, the Court also rejects this "first-time" aspect of Lopez's materiality argument about the Fort Lauderdale meeting for the same reason.

of the completion of the FPAS deal.  Defendants, especially Martinez, repeatedly referenced the timing of the FPAS deal in their openings and thus focused on Burzaco's changed testimony regarding the deal in their *Brady/Giglio* motions.  (*See* Dkt. 1904-1, at 4 ("In his opening statement, counsel for Mr. Martinez told the jury that when the evidence came in, they would doubt Mr. Burzaco's claim[s][,]" including Burzaco's claim "to have described in detail how the bribes were being paid, and that certain contracts used to pay bribes needed to be moved off T&T's books before the FPAS acquisition." (citing Tr. 204).)  To be sure, Burzaco's change in testimony about when the D&D Meeting occurred in relation to the FPAS acquisition (and the related discussions about "tidying up" contracts), served to undercut Defendants' extensive "preview" of the anticipated evidence about Burzaco's lack of credibility in their openings.  But certainly not to an irreparable or even significant extent.

Moreover, although Defendants might believe that one of their major arguments for Burzaco's alleged mendacity was grounded in the timing of the FPAS acquisition in relation to the D&D meeting[20]—such a belief does not make inconsistencies regarding the two topics material. Especially when there is a veritable ocean of impeachment material both provided by the Government and otherwise available to the defense on both issues.  For the D&D Meeting alone, Defendants had ample inconsistencies and omissions that they were able to cross-examine Burzaco about.  (*See* Tr. 2049:2–2059:8 (Lopez's counsel cross-examining Burzaco on the inconsistencies

---

[20] The Court understands that Defendants expected Burzaco to testify that he met with Defendants at the D&D Meeting, in part, to discuss the need to "tidy up" dirty contracts before the FPAS acquisition.  However, the FPAS acquisition was already largely complete by the time the D&D Meeting allegedly occurred.  Thus, Defendants anticipated that one of their strongest arguments against Burzaco's credibility would be that Burzaco entirely fabricated the D&D Meeting because it would be nonsensical to discuss hiding contracts from a diligence process that was already complete.  (*See* Tr. 1433:19–22 (Martinez's counsel explaining "[w]e opened on that point[,] that . . . the reasons why Mr. Burzaco gave for having that [D&D] meeting then, and before the FPAS acquisition, made no sense.").)

in his 302s regarding the timing of the D&D meeting and the alleged discussions Burzaco had with

Defendants at the meeting).)  At closing, Defendants will have even more impeachment evidence

against Burzaco to argue he should not be believed about the D&D Meeting—or anything else he

has said regarding Defendants' knowledge of the bribery scheme.  In short, when viewed against

the backdrop of the voluminous material to impeach Burzaco available to the defense, the changes

in Burzaco's testimony about the D&D Meeting are cumulative impeachment evidence and simply

not material.

Thus, the Court finds that any undisclosed impeachment evidence regarding the D&D

Meeting, the January 9, 2012 email, or the Buenos Aires Meeting is cumulative and consequently

not material, so as to have triggered the Government's duty to disclose under *Brady/Giglio*.[21]

* * *

In sum, the Court just does not find that any changes or omissions in Burzaco's trial

testimony which were not disclosed pre-trial had a reasonable probability of altering the result of

the proceedings.

## II.    The Government Did Not Commit a *Napue* Violation

### A.    Legal Standard

"[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair,

and must be set aside if there is any reasonable likelihood that the false testimony could have

affected the judgment of the jury."  *United States. v. Agurs*, 427 U.S. 97, 103 (1976) (internal

---

[21] Moreover, as discussed, evidence impeaching a witness is "not unambiguously material" when the witness's testimony is not "the only evidence linking the defendant to the crime[.]" *Jackson*, 2007 WL 2275848, at *11 (quoting *Avellino*, 136 F.3d at 256).  Thus, the Government's presentation of additional evidence, other than Burzaco's testimony, as the trial proceeds linking Defendants to the charged crimes would further lessen the potential materiality of any undisclosed impeachment evidence going to Burzaco's credibility.

citation omitted) (ultimately quoting *Napue v. Illinois*, 360 U.S. 264, 271 (1959)).   In other words, to challenge a prosecutor's knowing use of false testimony, a defendant must show three things: (1) there was perjured testimony, (2) "the Government knew or should have known that the testimony was false," and (3) there was "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Helmsley*, 985 F.2d 1202, 1205–06 (2d Cir. 1993) (quoting *Agur*s, 427 U.S. at 103).

Importantly, there is a distinction between perjured/false testimony and "[s]imple inaccuracies or inconsistencies in testimony." *United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001) (citing *United States v. Sanchez*, 969 F.2d 1409, 1414–15 (2d Cir. 1992)).   "A witness commits perjury if he gives false testimony concerning a material matter *with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory*." *Id.* (emphasis added).

**B.    Analysis**

The Court rejects Martinez's claim that the Government sponsored perjured testimony by Burzaco in violation of *Napue*, because Burzaco's inconsistent testimony does not rise to the level of perjury.   Martinez alleges that Burzaco gave perjured testimony about three events: (1) the D&D Meeting, (2) the January 9, 2012 email, and (3) the January 10, 2012 Buenos Aires Meeting.   (Dkt. 1904.)   But, based on the nature of the discrepancies and the Court's observations of Burzaco at this trial, as well as during the 2017 trial, the Court does not find that any discrepancies in Burzaco's testimony regarding these events are the result of Burzaco's "willful intent to provide false testimony." *Monteleone*, 257 F.3d at 219.[22]   Rather, given the lengthy course of alleged

---

[22] It came to light during the trial that Burzaco had requested the transcript of his first few days of direct testimony from the Government.   Upon the Government's refusal, Burzaco obtained a copy of it from his private counsel, along with the transcript of the parties' opening statements. Burzaco also had a brief conversation with his private counsel regarding Defendants' opening

conduct between Burzaco and Defendants, which included many meetings and other communications and the passage of time since these events, the Court finds the inconsistencies in Burzaco's testimony about the precise times, locations, and substance of each encounter with Defendants to be consistent with the limits and idiosyncrasies of human memory, rather than the product of intentional perjury.   Indeed, Burzaco explained repeatedly during direct and cross-examination that his memory regarding events that occurred over ten years ago has grown increasingly fuzzy over time and leads to some inconsistency when recounting those events.  (*See, e.g.*, Tr. 651:9–11 (Burzaco explaining on direct examination why he cannot clearly remember the first time he discussed bribery with Lopez, stating "[i]t's difficult to determine exactly [the] time because sometimes memory shrinks moments"); Tr. 3020:8–14 (Burzaco explaining on cross-examination why he cannot remember the location of the Buenos Aires Meeting, stating "I cannot re[member] now where was this meeting . . . if it was either in my office or at lunch because I had many lunches with [Martinez] . . . . So I can make a deduction, but not a memory because [my] memory starts mixing other meetings.").)

---

statements.  To the extent Defendants argue that these incidents demonstrate a willful attempt by Burzaco to commit perjury, the Court rejects that argument.  First, the evidence shows that Burzaco did not receive any trial transcripts until *after* he had testified for three days on direct examination, which included his testimony about the three events underlying the *Napue* motion.  Second, the evidence fails to demonstrate that Burzaco learned any details of Defendants' opening statements regarding these three events, including the D&D Meeting, prior to testifying.  Although there is some inconsistency between what Burzaco's counsel recalls relaying to Burzaco about the openings and what Burzaco recalls being told, the Court credits Burzaco's recollection of his conversations with his counsel.  The Court questioned Burzaco in open court under oath, outside the jury's presence, about what he recalls from that conversation with his counsel, which did not include any details about any of the three events.  Third, based on the Court's ability to view and hear Burzaco's testimony over the course of 11 days during the trial (as well as during the 2017 trial), the Court finds credible his testimony that he only sought the transcript of his own testimony, solely for the purpose of reviewing it for transcription errors.  The Court further credits Burzaco's explanation that his recollection of events—including dates, locations, and substance—is imperfect due to the passage of time and the volume of such events given his involvement in numerous, wide-ranging bribery schemes for over a decade.

Thus, the Court finds that Burzaco's inconsistent statements do not rise to the level of perjured testimony and rejects Martinez's assertions that the Government knowingly sponsored perjury.  Martinez's request for an evidentiary hearing and a mistrial are denied.

## III.   The Government Did Not Commit a 3500 Violation

### A.   Legal Standard

Pursuant to the Jencks Act, the Government must produce "any statement . . . of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(a).  The statute further defines "statement" as "a written statement made by said witness and signed or otherwise adopted or approved by him," a recording or transcript thereof, or grand jury testimony, and that the material only needs to be produced after the Government's witness "has testified on direct examination[.]" 18 U.S.C. § 3500(a), (e).  Importantly, the Jencks Act does not require the Government to take written notes of witness interviews because "the Government's representative may have no way of knowing, upon hearing a witness's statement, that the statement is inconsistent with what the witness will say at a later time." *Rodriguez*, 496 F.3d at 225.

### B.   Analysis

Defendants allege Section 3500 violations based on testimony provided by Burzaco during his direct and cross-examinations that was either not referenced in or inconsistent with Burzaco's 3500 material.  (*See* Dkts. 1904, 1916, 1920.)  First, as the statute makes clear, the Government is only obligated to produce 3500 material *after* a witness's direct testimony.  Thus, any allegations that the Government failed to disclose Burzaco's proffer statements prior to the start of trial fails under Section 3500.[23]  Second, the Jencks Act only requires the Government to produce written

---

[23] The Court, of course, understands that the practice in this courthouse, which was followed in this case, is for the Government to produce 3500 material in advance of trial on a date

statements related to their witnesses, but does not obligate the Government to take notes during its interviews with them.  Here, the Government represents that it has fully complied with its 3500 obligations and disclosed all relevant information. (Dkt. 1906, at 1–2.)  Thus, Defendants cannot seek relief pursuant to Section 3500 for changes in Burzaco's testimony that were not memorialized in the Government's written statements.  *See Rodriguez*, 496 F.3d at 222, 224 (holding that the Government did not commit any Jencks Act violations when it failed to take notes of a witness's statements that constituted possible impeachment evidence).[24]

Defendants further ground their 3500 claim in broader concerns for fairness.  (*See* Tr. 1455:6–22 ("We all know what 18 U.S.C. [§] 3500 requires and when it requires it, but there's a reason for the practice in this District and many others since time immemorial to treat those 302s like their witness statements . . . to have them disclosed prior to trial which is inarguably not required by statute, and it's all out of a sense of fairness. . . . So . . . notwithstanding the literal requirements of 3500 is a rubric in which a fair trial is provided to defendants and we rely on that as well.").)  However, the Court finds no unfairness here.[25]  The defense learned of the changes in

---

specified by the Court.  In fact, here, Defendants had the majority of Burzaco's and other government witnesses' 3500 material more than nine months in advance of trial.  (*See* Dkt. 1906-1, at 2 ("The government produced 119 of th[e] [143] documents more than nine months ago, on April 11, 2022. All but two of the § 3500 documents were produced before the jury was sworn.").)  That practice, however, does not alter the legal requirements of the Jencks Act, and the Government cannot be found to have violated it simply by not providing 3500 material before trial or before the witness testifies.

[24] To be sure, the Government can still violate its *Brady/Giglio* obligations even if it meets its 3500 obligations.  *See Rodriguez*, 496 F.3d at 225 ("When the Government is in possession of material information that impeaches its witness or exculpates the defendant, it does not avoid the obligation under *Brady/Giglio* to disclose the information by not writing it down [and thus avoiding 3500 requirements].").  But as detailed above, the Court finds that the Government has met its *Brady/Giglio* obligations in this case.

[25] Although the Court initially voiced concerns about the potential "unfairness" of the Government not producing 302s memorializing changes or additional details in Burzaco's

Burzaco's testimony—which mostly concerned inconsistent or previously omitted details about meetings with Defendants—at the outset of the trial (during Burzaco's direct testimony, which lasted almost six days) and with ample time to respond to them.  As the Court has previously stated, Defendants' "fairness" concerns result mostly from Defendants' own strategic choice to "open on facts that [defense counsel] believe[d] to be established through the 302s."  In the absence of a *Brady*/*Giglio* violation, any fairness issues are adequately remedied through cross-examination and the introduction of admissible extrinsic evidence, such as the testimony of FBI agents who were present at the witness proffer sessions.  (Tr. 1500:13–17.)

## CONCLUSION

The Court denies Defendants' motions for relief under *Brady*/*Giglio* and Section 3500. The Court also denies Martinez's motion for relief under *Napue*.

SO ORDERED.

/s/ Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated: February 13, 2023
        Brooklyn, New York

---

statements to the Government (*see* Tr. 1505:5–11, Tr. 1827:12–25), upon further reflection and consideration of the applicable legal standards, the Court finds these concerns unwarranted.