NORTON ROSE FULBRIGHT

Norton Rose Fulbright US LLP
1301 Avenue of the Americas
New York, New York 10019-6022
United States of America

Direct line +1 212 318 3340
mayling.blanco@nortonrosefulbright.com

Tel +1 212 318 3000
Fax +1 212 318 3400

March 4, 2025

**Via ECF**

The Honorable Pamela K. Chen
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: *United States v. Hernán Lopez,* No. 15-252 (S-3) (PKC)
Motion for a Continued Pause on Distribution of Funds

Dear Judge Chen:

As you know, we represent Full Play Group S.A. ("Full Play") in the above-referenced matter. We write pursuant to Fed. R. Civ. P. 65 for an Order maintaining the status quo pending the appellate review of Full Play's acquittal and enjoining the Government from distributing approximately $100,189,754.61 in funds transferred from Bank Hapoalim (the "Funds") and held by the Department of Justice's Money Laundering and Asset Recovery Section ("MLARS"). The Government recently stated that it will be distributing those funds as soon as this Friday, March 7, 2025 and refused Full Play's overtures to continue its October 17, 2023 abeyance from distributing those funds pending a ruling on this issue from the Court. Given the imminent decision from the Second Circuit and the likelihood of irreparable harm should remission continue now, Full Play is forced to file this order to show cause seeking a preliminary injunction simply to maintain the status quo. Kindly accept this letter brief in lieu of a more formal submission.

Norton Rose Fulbright US LLP is a limited liability partnership registered under the laws of Texas.

Norton Rose Fulbright US LLP, Norton Rose Fulbright LLP, Norton Rose Fulbright Australia, Norton Rose Fulbright Canada LLP and Norton Rose Fulbright South Africa Inc are separate legal entities and all of them are members of Norton Rose Fulbright Verein, a Swiss verein. Norton Rose Fulbright Verein helps coordinate the activities of the members but does not itself provide legal services to clients. Details of each entity, with certain regulatory information, are available at nortonrosefulbright.com.

**A. Background**

As the Court is well aware, on September 1, 2023, Your Honor vacated the conviction of Full Play because 18 U.S. § 1346 "does not apply to foreign commercial bribery schemes" (the "Rule 29 Decision"). *United States v. Full Play Group, S.A.*, No. 15-CR-252(S-3)(PKC), 2023 WL 5672268, at *26 (E.D.N.Y. Sept. 1, 2023); (*See* Dkt. 2023, at 53). The underlying conviction related to various international soccer tournaments, including Copa América and Copa América Centenario, for which Datisa S.A. ("Datisa") held media marketing rights. *Id.* at 5. Full Play is a one-third shareholder of Datisa. *See* Declaration of Mayling Blanco dated March 4, 2025 ("Blanco Decl."), Ex. A ¶ 3. The Court expressly recognized that it was "premature to opine on [the Rule 29 Decision's] effect on the convictions of defendants in this case who have previously pled guilty or been convicted under § 1346" and extended that stay to other proceedings in this case pending final decision from the Second Circuit. *United States v. Full Play Grp., S.A.*, 690 F. Supp. 3d 5, 40 n. 33 (E.D.N.Y. 2023); *see also* 09/07/2023 Minute Entry (the Court sua sponte staying sentencings); 12/01/2023 Minute Entry Order (deferring ruling on defendant Napout's 2035 Petition for a Writ of Error Coram Nobis).

The Government appealed the Court's Rule 29 Decision on September 22, 2023. *See* ECF No. 2027-28. The Second Circuit has not yet issued a decision.

This matter has been ongoing for nearly a decade and has involved dozens of defendants – individuals and corporations – relating to a complex intertwining set of sports marketing rights and entities with interests in those rights. Throughout, the Government maintained that certain payments made in relation to those marketing rights were a violation of Section 1346 "honest services fraud" and secured pleas, convictions, and pursued forfeitures on that basis. With that

background, on March 13, 2020, Full Play signed the Stipulation of Settlement in Forfeiture Ancillary Proceeding (the "Stipulation"). *See* Blanco Decl., Ex. A. As recognized therein, Full Play is a party with legal interest in the Funds. *Id.* ¶ 1. The Stipulation provided that the "government, consistent with U.S. law, ***shall recognize a credit*** of the Forfeited Funds towards the forfeiture obligations of FPG, Traffic, Torneos, and their respective shareholders, including, in the case of FPG, Hugo Jinkis and Mariano Jinkis, in whatever manner the Parties may agree." *Id.* ¶ 3. In exchange, Full Play would continue with the liquidation of Datisa, assist the Government in effectuating the forfeiture of the Funds, including by executing the necessary documents and defending against any third-party claims to the Funds, and forfeit its interest in the Funds. *Id.* ¶¶ 7-9.

Full Play abided by the terms of the Stipulation for the purposes of securing the "credit" it was promised therein. In fact, prior to the Rule 29 Decision but after the jury's verdict, the Government sought assistance with administrative documents for the transfer of the Funds to the United States. *See* Blanco Decl. ¶ 7. Full Play promptly compiled with these requests. *Id*.

In September or early October of 2023, soon after Your Honor's Rule 29 Decision, Full Play learned that the foreign bank where the Funds were maintained had received communication from the Government to transfer the Funds to the United States. *Id.* ¶ 8. Given the scope of the Rule 29 Decision, the perceived likelihood of the Government's appeal to the Second Circuit, and the recognition that the Second Circuit's decision would have broad bearing on this case, Full Play sought the Government's consent for a stay of further execution of the forfeiture and remission proceedings relating to the Funds. *Id.* ¶ 12. On October 17, 2023, the parties eventually reached an agreement by which the Government would maintain the status quo with regards to the Funds.

*See* Blanco Decl., Ex. B (the "Hold Letter"). More specifically, the Government "confirmed that a restoration **hold** has been placed on the [Funds], which ensures that the ***funds remain unavailable for distribution*** absent additional action." *Id.* at 1. In acknowledgement of the "potential impact, if any" of the Rule 29 Decision, the Government agreed to "provide Full Play with notice of at least fourteen (14) days prior to release of the restoration hold on the Datisa Funds." *Id.* at 1-2.

There has been no material change to the posture of this case since October 17, 2023. There has been no decision from the Second Circuit regarding the Rule 29 Decision.[1] Further, to Full Play's knowledge, no change has occurred relating to the Funds in the Government's possession. Yet, on Friday, February 21, 2025 at 4:39 pm, the Government provided notice that it "intend[s] to lift the restoration hold and remit additional forfeited funds to the victims as soon as March 7, 2025." *See* Blanco Decl. ¶ 11.

Full Play attempted to secure a continued stay of the Government's actions until the Second Circuit issues its decision or to allow for the Court to consider the present motion on a non-urgent basis. *See id.* ¶ 12. The Government refused, instead indicating that despite the pending Second Circuit appeal, it intended to fully remit funds[2] to victims "FIFA, CONCACAF, and CONMEBOL . . . for the World Football Remission Fund, a nonprofit focused on women's/girl's football, education, youth programs, community outreach and humanitarian needs" to complete the $201

---

[1] Oral argument was heard before the Second Circuit on January 8, 2025, which may be indicative that a decision is forthcoming soon. *See* Dkt. No. 112.

[2] It is our understanding that the remitted funds are to be used in satisfaction of petitions for remission previously granted in favor of victims FIFA, CONMEBOL, and CONCACAF in the matter of *United States v. Brayan Jimenez*, 15-CR-252. *See* Blanco Decl., Ex B at 1.

million award to them which had been partially satisfied. *See id.* ¶ 13. The Government further reiterated that it "intend[s] to proceed with remission of the Datisa funds as soon as March 7, 2025." *See id.*

Without a Court order compelling the Government to restore the pause in distribution of the Funds, over $100 million will be remitted for use by the soccer organizations. Further, an affirmance of the Rule 29 Decision will likely present legal issues for the Court's consideration that may impact the distribution of the Funds. The Court, however, does not need to expend time or resources considering the potential impact on this forfeiture in hypothetical terms while appellate review remains ongoing. Today, Full Play seeks nothing more than to restore the pause that has been in place pending appellate review of the Rule 29 Decision.

**B. Legal Analysis**

Given the potential of irreparable harm, the fact that appellate review remains outstanding, the compelling public interest in preserving judicial and prosecutorial resources, and that the appellate decision may implicate the continued enforceability of the Stipulation, the Government should be enjoined from distributing the Funds at this point in time. A party seeking injunctive relief through either a temporary restraining order or a preliminary injunction must "establish (1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008); *Felix v. Brand Serv. Group LLC*, 957 N.Y.S.2d 545, 547 (App. Div. 4th Dep't 2012) (granting a preliminary

injunction to prevent the release of funds in escrow to preserve the status quo during the pendency of litigation); *Baptichon v. Fed. Rsrv. Bank of Minneapolis*, No. 24-CV-6748 (PKC) (LB), 2024 WL 4350825, at *1 (E.D.N.Y. Sept. 30, 2024). Full Play meets each of these factors.

### (i) Remittitur is Irrevocable thus Presenting an Irreparable Harm

If the Funds are remitted, rather than held in abeyance pending appellate review, there will be irreparable harm because remittitur is irrevocable. Since it is highly improbable that dispersed funds could later be recovered, the premature distribution of funds qualifies as irreparable injury. *Felix*, 957 N.Y.S.2d at 547 (holding that a plaintiff was entitled to a preliminary injunction preventing defendants from releasing funds in escrow because "[w]hile defendants may be delayed in paying off debt or using the escrow money for other purposes, plaintiff may never be able to recover the money, if disbursed"); *see also In re Motors Liquidation Co.*, 539 B.R. 676, 683 (Bankr. S.D.N.Y. 2015) (finding that since it would be impossible or very difficult to get any distributions back, the release of funds before an appeal was decided qualified as an irreparable injury). The Government has indicated it intends to **immediately** (as soon as this Friday) remit $100 million to "victims" for their use in various soccer interests across the globe. *See* Blanco Decl. ¶ 13. If the Funds are remitted, it will be virtually impossible to reverse that process. The Funds and any party's interests, rights, claims, or arguments relating to those Funds will be forever and irreversibly lost.

There is also no harm in continuing the pause, which weighs in favor of granting Full Play the injunction it seeks. Where "the public would be unharmed by the preliminary injunction because the dispute is limited in nature," the balance favors granting the injunction as "the public faces no negative consequences from the preliminary injunction." *State Farm Mut. Auto. Ins. Co.*

*v. NYC Med. Treatments, P.C.*, No. 23-CV-03644 (NCM)(JAM), 2024 WL 3637919, at *6 (E.D.N.Y. Aug. 2, 2024), appeal dismissed (Jan. 29, 2025) (finding that since the injunction would enjoin only the parties, a preliminary injunction should be granted). The Funds are already in the control of the Government. The Funds have also been within the Government's reach for nearly five years and sitting in United States' accounts for over a year. Thus, there can be no urgency claimed by the Government. While the Funds will undoubtedly contribute to worthy causes, these are not emergency needs that would cause a critical harm if remittitur is not immediately fulfilled. Moreover, these organizations have already received partial remission from the United States of the $201 million awarded. Thus, no party will be prejudiced by a limited stay in distribution of the Funds pending appellate review of the Rule 29 Decision.

(ii) <u>Compelling public interest to preserve judicial and party resources</u>

The continuation of the pause will preserve judicial (and party) resources by not forcing a decision on issues pertaining to the remittitur, victims, judgments, forfeiture, and the Stipulation, which may ultimately be unnecessary since these turn on the yet to be issued appellate opinion. Second Circuit courts consistently stay execution of judgments pending appeals or other relevant proceedings. *See e.g., Boothe v. Rossrock Funds II LP*, No. 16-CV-900 (PKC), 2017 WL 2271360, at *3 (E.D.N.Y. May 23, 2017) (preventing transfer of property despite a foreclosure sale because of a pending appeal); *see also Garner v. Lee*, 908 F.3d 845, 858 (2d Cir. 2018) (granting a motion to stay a judgment when the respondent announced its intention to retry the petitioner if petitioner's appeal was unsuccessful). Even in the present matter, the Court has consistently stayed requests that have come before it pending the completion of the Second Circuit's appellate review. *See e.g.* 12/01/2023 Minute Entry ("the outcome of [the Second Circuit] appeal will undoubtedly have

bearing on Defendant Napout's 2035 Petition for a Writ of Error Coram Nobis.) As such, the Court defers ruling on Defendant Napout's 2035 petition pending final decision in [the Second Circuit]"). Despite the Court's prior rulings staying actions in this matter, the Government has inexplicably decided to move forward with the execution of the underlying judgment of forfeiture and remit the Funds to third parties. Depending on the outcome of the appeal, this Court may not have to reach a decision on the legal issues presented here.

By contrast, without a final holding from the appellate court, not only are the parties left to argue in hypotheticals, there is no way for the parties to know for sure the potential legal ramifications of that holding, and the parties could find themselves visiting related issues not previously contemplated. This Court has found that a movant suffers hardship when it shows that if preliminary relief is denied, it will experience inconsistent judgments and will waste time and resources fighting the inconsistencies. *State Farm*, 2024 WL 3637919 at *4; *see also State Farm Mut. Auto. Ins. v. Eclipse Med. Imaging*, 700 F. Supp. 3d 4, 12 (E.D.N.Y. 2023) (recognizing that the "risk of inconsistent rulings" shows irreparable harm). Only with the final appellate decision in hand will Full Play be able to evaluate that opinion's potential impact, if any at all, on the Stipulation and other aspects of the case. Thus, the public's interest in the preservation of judicial and party resources would be furthered only if the pause is continued.

(iii) <u>Serious legal issues remain outstanding</u>

It makes little sense for Full Play to articulate, and the Court to invest resources in considering, hypothetical arguments that are dependent on an unissued appellate decision. However, sufficiently serious legal questions remain pertaining to the Stipulation and the underlying pleas and forfeitures that are dependent on the outcome of the appeal, such as the

continued enforceability of the Stipulation and underlying forfeiture should the appellate review affirm the acquittal. Courts have contemplated that under compelling circumstances settlement agreements may be vacated under Rule 60(b)(5). *See cf. SEC v. Conradt*, 309 F.R.D. 186, 187 (S.D.N.Y. 2015) (recognizing that "compelling circumstances" could exist to vacate a settlement agreement under Rule 60(b)(5), although finding that such did not exist in that particular case to relieve a defendant from its settlement with the SEC when his parallel conviction was vacated). In *Conradt*, after pleading guilty to insider trading, the defendants also entered into a settlement agreement in a parallel but separate proceeding with the SEC. *Id.* The guilty pleas were then vacated, but the court did not vacate the settlement agreements. *Id.* at 188. The court found that the decision that allowed for the vacated guilty pleas had not materially changed the law, and even if it had, "when it comes to civil settlements, a deal is a deal, absent far more compelling circumstances than" were presented in that matter. *Id.*

*Conradt* is distinguishable in several ways. First, unlike in *Conradt*, where the civil and criminal action were independent, the Stipulation here is intertwined with the criminal action where the underlying criminal pleas, which Your Honor has stayed pending the appeal process, form the basis for the forfeiture proceedings. For example, the Stipulation is directly dependent on the forfeiture proceedings resulting from the guilty plea of Alejandro Burzaco and others. *See* Blanco Decl., Ex. A ¶ 1; Dkt. Nos. 91 and 110 (Preliminary Order of Forfeiture as to Alejandro Burzaco). Additionally, the Government has attempted to execute on the Funds based on the forfeiture proceedings related to Brayan Jimenez's guilty plea, a plea which may be impacted by the acquittal ruling. *See* Blanco Decl., Ex. B at FN 1; Dkt. No. 1706 (Partial Order of Forfeiture as to Brayan Jimenez). Second, and of critical import, in *Conradt*, there was no pending appeal

(thus, the criminal case was final). Third, the *Conradt* settlement agreement was with an agency different from the prosecution, an agency which is subject to a lower burden of proof and does not carry all the heavy effects that come with criminal matters. *Id.* at 187. Fourth, *Conradt* had the benefit of relying upon precedent that had found that the basis for the *Conradt* acquittal did not overrule prior decisions of the court. *Id.* at 188. In contrast, we have no such precedent here and further appellate court decisions may speak to whether the findings here are or are not a new law or rule which could have an effect as well. Other cases where the court has refused to grant stays are similarly distinguishable because there was no outstanding appeal or novel issues of law. *See, e.g. United States v. Bank of New York*, 14 F.3d 756, 758 (2d Cir. 1994); *see also S.E.C. v. Alexander*, No. 06-CV-3844 (NGG) (RER), 2013 WL 5774152, at *1 (E.D.N.Y. Oct. 24, 2013) (defendant in *Alexander* had no pending appeals). Here, once appellate review is complete, we may well have the compelling circumstances contemplated in *Conradt*.

Once appellate review is complete, serious questions may arise regarding the continued enforceability of the Stipulation, the underlying forfeiture, and/or relief pursuant to Rule 60(b). The essential purpose of the Stipulation may be so undermined that Full Play is deprived of the benefits of the deal such as to warrant being released. A party may be released from its obligations under an agreement where there is a material breach that "defeats the [agreement's] essential purpose". *Feldmann v. Scepter Grp., Pte. Ltd.*, 128 N.Y.S.3d 13, 14 (App. Div. 1st Dep't 2020) (finding that a party was released from his contractual obligations when the opposing party committed a material breach) (citing *Old Town Woolen Co., Inc. v Fishman & Son, Inc.,* 218 App Div 472, 474, 218 NYS 497 (1st Dept 1926)).

Full Play entered the Stipulation with the understanding that it must receive certain benefits in exchange for agreeing to forfeit and waiving all its right to the Funds. *See* Blanco Decl., Ex. A ¶ 3. The most critical of these benefits was the recognition of "credit" towards any independent forfeiture obligations of Full Play or the Jinkises. *See Id*. This consideration was not a condition of "if" there is forfeiture or a resolution with Full Play or the Jinkises, but rather it is a "shall" – thus a fundamental requirement of the Stipulation. Full Play was under no other obligation and was offered no other inducement for entering into the Stipulation; in fact it was indicted a few days later on March 18, 2020. Full Play has not and may not ever receive the very benefit it bargained for.

More specifically, the terms of the Stipulation state:

> The government acknowledges that Full Play, Traffic, and Productora (collectively, the "Datisa Shareholders") each has a one-third (1/3) beneficial interest in Datisa. Provided and to the extent that the Forfeited Funds are finally forfeited and transferred to the United States, the government, consistent with U.S. law, ***shall recognize a credit*** of the Forfeited Funds towards the forfeiture obligations of Full Play, Traffic, Torneos, and their respective shareholders, including, in the case of Full Play, Hugo Jinkis and Mariano Jinkis, in whatever manner the Parties may agree.

The language is clear: Full Play ***must*** receive credits towards forfeiture as consideration for waiving its rights as to the Funds. If the Government cannot provide a credit for Full Play's interest in the $100M, then the essential purpose of the agreement is thwarted, and Full Play may be entitled to release from the Stipulation.

Further legal issues may also exist pertaining to the potential relief pursuant to Rule 60(b) and the underlying pleas and forfeitures. Rule 60(b) provides that on "just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the

following (among other) reasons: (1) mistake, inadvertence, surprise, or excusable neglect; . . . (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief." Fed. R. Civ. P. 60(b). Depending on the outcome of the appellate review, Full Play may have legal challenges based on the applicability of this rule.

Full Play may never seek to vacate the Stipulation or relief pursuant to Rule 60(b), and is certainly not asking that it be released today. However, the final appellate opinion relating to the Rule 29 Decision may present important legal issues relating to the continued enforceability of the Stipulation or Rule 60(b) relief for the Court's consideration at some future date. We are only seeking to maintain the status quo until that time.

**C. Conclusion**

For the foregoing reasons, Full Play respectfully requests the Court order that the Government, inclusive of MLARS, be prevented from taking any action with regards to the Funds, and shall take all reasonable steps to ensure the status quo with regards to those funds, pending final appellate resolution of this Court's September 1, 2023 Rule 29 Decision. Further, Full Play respectfully requests that the Government show cause why a temporary pause should not continue and to enjoin the Government from disbursing approximately $100,189,754.61 transferred from Datisa's foreign account and currently under the possession and control of Department of Justice and MLARS until 30 days after final appellate review of Full Play's acquittal.

We remain very much appreciative of Your Honor's time and consideration of this request, particularly in light of the extra burden given its immediacy.  We remain at the Court's disposal for any questions.


Respectfully submitted,

*/s/ Mayling C. Blanco*

Mayling C. Blanco


MCB/KF